[No. 36001. En Banc. December 6, 1962.]

GENERAL MOTORS CORPORATION, *Respondent and Cross-appellant*, v. THE STATE OF WASHINGTON *et al.*, *Appellants.**

*Reported in 376 P. (2d) 843.

*The Attorney General, John W. Riley* and *Timothy R. Malone, Assistants,* for appellant.

*Rosling, Williams, Lanza & Kastner* and *DeWitt Williams* (*Aloysius F. Power, Donald K. Barnes,* and *Thomas J. Hughes,* of counsel), for respondent.

FINLEY, C. J.—This action was commenced by respondent cross-appellant, General Motors Corporation, for a refund of certain business and occupation taxes imposed by the State Tax Commission and for injunctive protection against similar assessments in the future.

The taxes involved were measured by gross receipts to General Motors from wholesale sales of automobiles, trucks, parts and accessories to independent retail dealers in the state. Assessments were made pursuant to RCW 82.04. General Motors duly protested the assessments, and hearings were held by the Tax Commission. The hearings resulted in Tax Commission orders concluding that General Motors had conducted business activities within the state of Washington during the audit periods in question, which are from January 1, 1949, through June 30, 1953, which were sufficiently related to the sales in question to meet the requirements of the due process clause of the federal and state constitutions and the commerce clause of the federal constitution. Accordingly, the tax was imposed. Thereupon, General Motors sought relief in the Superior Court for Thurston County. The superior court granted portions of General Motors' prayer for relief and denied the balance. Both parties have appealed.

The amounts of gross receipts from the transactions which are included in the assessment base are not in question. There is no question either as to the rate of the

tax, which, during the audit periods herein involved, was three-tenths of 1 per cent (.003%), measured by the taxpayer's gross receipts from its taxable activities (wholesaling). The computation of the tax assessment and the interest involved have been settled by stipulation of the parties. The basic question presented to this court is whether General Motors is liable for the tax assessed.

General Motors is a Delaware corporation, qualified to do business in Washington. The corporation conducts much of its business through divisions which operate substantially independently of each other. The transactions of only Chevrolet, Pontiac, Oldsmobile, and General Motors Parts Divisions are included in the tax base involved in this action, although other General Motors divisions and subsidiaries are engaged in business within this state.

General Motors owns and operates factories for the manufacture of automobiles, trucks and other merchandise. Sales of these products are made by General Motors to retail dealers in this state pursuant to orders initiated by the dealers. All of the products herein concerned are manufactured outside of the state and are shipped into the state. Activities conducted primarily outside the state include the design, engineering, fabrication, assembly and delivery of products; the procurement of materials, components and supplies; the general, executive, operating, financial and sales management; the receipt, processing, recording, approving, accepting and filling of orders; the billing and receipt of payment, the investigation, approval and execution of customer contracts (dealer franchises); the investigation and extension of credit; the composition and placement of advertising; and others.

During the audit periods here in question, the trial court found that General Motors was engaged in business activity within the state. This activity involved the sale of automobiles, trucks, parts and accessories to retail dealers, and also included establishment and maintenance of effective dealer representation, partially accomplished by arranging various sales and incentive contests and programs offered

and conducted, separately or jointly, with the dealer and other components of the General Motors organization; national and local advertising programs conducted by General Motors through various media; joint programs conducted at the dealer's place of business to assist the dealer in maintaining and developing a prosperous used-car department, including training of dealer's service personnel in the art of reconditioning automobiles utilizing mobile trainers; and on the job training of dealer employees seeking to develop a strong and capable service department so as to increase the quality of service rendered to the retail purchaser of General Motors' products.

In order to provide for the distribution and sale of the manufactured products of Chevrolet, Pontiac, Oldsmobile and General Motors Parts Divisions, General Motors maintains organizations of employees serving each of its major subdivisions on a national, regional, zone and district level. This case is concerned with General Motors' business activities conducted within the state of Washington by its sales and promotion organizations—specifically, the divisions mentioned above during the audit periods here in question.

At all times during the audit periods, the state of Washington was included within the western region of General Motors' national organization covering eleven western states. Regions are divided up into geographical zones. At all times relevant herein, Washington was part of the Portland zone, which also included the states of Oregon and Idaho, the area that has now become the state of Alaska, and portions of Montana and Wyoming.

Each zone, including the Portland zone, is composed of geographical districts for the Chevrolet, Oldsmobile and Pontiac divisions. Within each district in the state of Washington are located the various retail dealers of General Motors' manufactured products, to whom wholesale sales of the manufactured products are made by General Motors.

The Portland zone organization for each of General Motors' Chevrolet, Pontiac and Oldsmobile divisions includes a staff of field representatives. Each zone organiza-

tion is similar in all material respects, except that Pontiac and Oldsmobile have a lesser number of dealers than Chevrolet, and a correspondingly lesser number of districts. The operation of the General Motors Parts Division and certain differences between the Chevrolet organization and the others will be described later. Generally, a zone office is comprised of a zone manager and an assistant zone manager, a business management manager, a parts and service manager, an office manager—car distributor, a number of clerical assistants, and service representatives and managers for each of the zones' districts. We are most concerned with the activities of the district managers, and the functions of other personnel need not be described in detail.

General Motors' field organizations devote the bulk of their efforts to the assistance of General Motors' retail dealers with the view of obtaining maximum conformance to the specifications and conditions required of the dealers pursuant to the "Dealer Selling Agreement," the terms of which will be described later.

General Motors achieves its wholesale sales of the automobiles, trucks, parts and accessories by the development and maintenance of a strong retail dealer representation; and General Motors' zone employees, including district managers, are charged with the responsibility of developing, maintaining, and promoting retail dealer representation, along with the general duties of promoting, developing, and maintaining good will and public esteem for General Motors' products. The trial court found that the activities of the field organization have a direct effect upon the sales and operations of the independent retail dealers.

The district manager's function includes serving as the zone manager's direct contact with the dealer at his place of business, receiving from him his complaints, observing his operations, reporting thereon to the zone office, and passing on to him such advice and counsel as the zone office can make available to strengthen his operation and make it more profitable, including passing on any knowledge gained of competitive products. District managers' contact and relationship with retail dealers is direct, almost entirely

inside the state of Washington, and generally at the dealer's place of business. The frequency of contacts depends upon the size of the dealership and the nature and extent of the problems confronting the dealer and General Motors. The district manager usually resides within his assigned territory. With the exception of certain activities in relation to the Chevrolet Division, district managers have no Washington offices; however, they frequently use their place of residence for business phone calls and receipt of business mail. District managers do not accept or approve credit, receive payment, or make delivery.

The relationship between General Motors and each of its Chevrolet, Pontiac, and Oldsmobile retail dealers is defined by a written contract called a "Dealer Selling Agreement," which is in all material respects uniform for all dealers in the state. The dealer operates a retail store for the sale of automobiles, and sometimes also trucks, supported by the sale of parts and accessories, a repair and servicing operation according to customers' needs, and the marketing of used cars taken in trade. Dealers are individual proprietorships, partnerships, or corporations, having no corporate relationship to General Motors, except that in some instances another division, Motors Holding Division, lends, temporarily, portions of the substantial capital required to initiate or maintain a dealership. The trial court found that the relationship between retailers and General Motors is that of independent purchaser and seller, and it cannot be said that General Motors had a "dealer organization" within its hierarchy.

The dealer's facilities are his own. He provides the tools, supplies, signs, and an inventory of parts and accessories. New and used automobiles are also owned by the dealer, subject, in the case of new automobiles, to financing arrangements with banks or finance companies, which frequently include General Motors Acceptance Corporation, a wholly owned corporate subsidiary of General Motors. The "Dealer Selling Agreement" provides certain restrictions on the dealers' use of their own facilities and equipment. A dealer is expected to maintain a place of business,

a sales room, and a service department satisfactory to General Motors. The dealer may not establish or move a branch sales office or service organization without written consent of General Motors. Every dealer is required to, and does, submit his books, records, and accounts to General Motors, and to maintain a satisfactory uniform accounting system designated by General Motors. Every dealer is required to meet minimum capital requirements as specified and determined by General Motors. Every dealer is required to, and does, maintain and erect uniform or standard product signs and is required to, and does, participate in advertising campaigns conducted nationally and locally by General Motors. Every dealer is required to carry in stock at all times parts and accessories sufficient to provide prompt and satisfactory service to retail purchasers of General Motors products. Dealers uniformly agree to buy such special tools as are developed by General Motors for the servicing of their products.

To each dealer is assigned a "zone of influence," within which he enjoys the distinction of being the only retail outlet of the specific product for which he is dealer. He is also considered responsible for development of General Motors' share of the retail market within his designated area.

The dealer submits quarterly "projections" of his requirements for automobiles, parts and accessories, to his district manager. Thereafter, an order is sent to General Motors' zone office, usually by mail, sometimes by telephone, and infrequently by the district manager, who then mails or delivers the order to the zone office. Orders are accepted or rejected at the zone office or at the factory; and, if accepted, they are filled by shipment from the factory by common carrier, f.o.b. the factory. If a dealer's orders are less than his "projections," the district manager, occasionally in conjunction with the zone manager, "counsels and advises" the dealer to determine the cause and to assist the dealer in taking corrective action.

The Parts Division of General Motors has the function of warehousing and shipping parts and accessories for Chev-

rolet cars and trucks and for Pontiac and Oldsmobile automobiles. Sales are made by this division to retail dealers on order. The division has a warehouse at Portland, Oregon; and during most of the period herein involved it also had a warehouse at Seattle. The warehouse at Seattle carried the "heavy volume" items. The less frequently called for items were ordered from the warehouse in Portland. Each dealer was furnished with two order forms. On one, he ordered from the Seattle warehouse items stocked there. On the other, he ordered directly from Portland items not carried in Seattle. Business and occupation tax was paid to the state on all shipments from the Seattle warehouse, and these taxes are not contested. Only the taxes measured by the gross proceeds of sales by the Portland warehouse to retail dealers in Washington are in dispute. The trial court found that the transactions of the Portland warehouse of the General Motors Parts Division were in no way related to the transactions of the Seattle warehouse of that division.

All of General Motors' retail dealers for Chevrolet, Pontiac, and Oldsmobile obtained their supply of parts and accessories for resale and servicing of new and used automobiles during the audit period in question from the General Motors Parts Division.

Chevrolet Division's operations with respect to the counties of Asotin, Clark, Columbia, Cowlitz, Garfield, Klickitat, Skamania, Wahkiakum, and Walla Walla are identical to those of the other divisions generally described above. Sales to retail dealers in these counties have been described by the parties as Chevrolet Class "B" transactions, and we will refer to them by that designation. The operations and sales to retail dealers with respect to the balance of the state, which hereinafter will be referred to as Chevrolet Class "A" transactions, are substantially similar, except that during the relevant periods involved Chevrolet Division maintained a branch office in Seattle. This office was supervised by the Portland zone manager for a time, and later a Seattle zone office was established. General Motors has paid the tax since the establishment of the new zone office, and that tax is not contested. While the Seattle

branch office was under the direction of the Portland office, it performed the function of expediting deliveries and performing limited promotional work. The trial court concluded that the presence of the Seattle office and the service that it performed had a direct connection with Chevrolet Class "A" sales by the Portland zone office; that such sales were within the territorial jurisdiction of the state; and that the tax measured by these transactions was not violative of the due process clause or the commerce clause. Accordingly, the Chevrolet Class "A" transactions were held taxable. This conclusion is a subject of the cross-appeal by General Motors.

In accordance with a contractual arrangement, retail dealers make annual returns of obsolete parts to General Motors and are allowed credits therefor. The trial court concluded that these parts returns were in fact repurchases by General Motors, and that the amounts attributable to these transactions are properly includable in the gross proceeds of sales of products by General Motors to Chevrolet Class "A" retail dealers. This conclusion is also a subject of the cross-appeal by General Motors.

With respect to all other transactions included within the tax base, the trial court adjudged that General Motors was entitled to recover judgment of refund to the extent of $88,479.44, with interest. General Motors was also granted an injunction against the State of Washington, the Tax Commission, and its members, preventing assessment or collection of any business and occupation tax in connection with transactions past and future not materially different from the transactions involved in this action.

We will proceed by first analyzing the problems involved with respect to those transactions that are the subject of the Tax Commission's appeal. Some of our discussion will relate incidentally to that portion of the cross-appeal dealing with Chevrolet Class "A" transactions.

We note preliminarily that, in our opinion, like the tail that follows the dog, the tax measured by the gross proceeds of sales by the Portland warehouse of the General Motors Parts Division must stand or fall with the taxes measured

by the gross proceeds of the other transactions. Although the General Motors Parts Division does not have a field organization similar to that of the other divisions, the sales of parts and accessories is inseparable from that activity which relates to the development and maintenance of dealer representation and stimulates demand for the automobiles and trucks that parts and accessories accompany. Furthermore, the parties have not segregated their arguments with respect to the activities of the different divisions, so it is safe to assume that the activities of the field organizations of Chevrolet, Pontiac, and Oldsmobile are properly attributable to the corresponding sales by Chevrolet, Pontiac and Oldsmobile retail dealers of parts and accessories wholesaled by General Motors Parts Division.

The first question presented in this case is whether there is a statutory basis for imposing a tax on General Motors for the activities conducted by it within the state during the relevant period involved.

■■■ The trial court found that General Motors was engaged in business in the state of Washington at all times during the audit periods here in question. It also found that General Motors' activities, through its employees, had a direct effect upon the sales and operations of the independent retail dealers. The business and occupations tax statute, RCW 82.04.220, imposes a tax on the privilege of engaging in business activities. General Motors accomplishes wholesale sales of its products to retail dealers within the state. Part of the activities involved in these wholesale sales take place elsewhere; e.g., orders are filled, delivery made, and payment is received outside of the state. Nonetheless, business activities having a relation to wholesale sales are conducted in Washington.[1] These activities provide an incident upon

---

[1] The trial court did not specifically find that the business activities conducted by General Motors were related to the wholesale sales consummated by General Motors to retail dealers, but such a finding is unnecessary in view of other specific findings mentioned above. Since the activities of General Motors had a direct effect on the sales of retail dealers, those activities necessarily had a direct effect on whole-

which the taxing statute operates.[2] Whether or not these activities are sufficiently related to the accomplishment of wholesale sales to base the tax on the gross receipts of all wholesale sales to Washington retail dealers is a question with constitutional law ramifications in relation to the *measurement* of the tax and not the *imposition* of the tax. On the facts indicated, we hold that there is a statutory basis for imposing the tax. We will now proceed to the crucial questions presented; *i.e.*, whether the imposition of the tax measured by the gross receipts of all wholesale sales to Washington retail dealers is violative of the due process clauses of the federal and state constitutions or the commerce clause of the federal constitution.

Does the tax amount to an attempt by the State of Washington to extend its taxing powers beyond its borders? Or, to put it another way, are the gross proceeds included in the measure of the tax sufficiently related to the nexus of local activity conducted by General Motors to be within the state's power to tax?

▇ Much discussion by both parties in voluminous briefs and in oral argument relates to the significance of the presence or absence of a local office as a criterion for determining whether the state has power to tax a corpora-

---

sale sales to retail dealers. The extensive field organization work undertaken by General Motors to assist retail dealers in maintaining a desired sales volume is performed because greater retail sales by retail dealers also means greater wholesale sales by General Motors to retail dealers. Significantly, the trial court refused to find that the activities of General Motors were unrelated to wholesale sales of General Motors to retail dealers.

[2]We have examined Rule 193 promulgated by the Tax Commission, which it is contended binds the Tax Commission to an interpretation that transactions such as those involved here are beyond statutory coverage. Rule 193 was intended to be a general guide rather than a final interpretation as to transactions covered by the taxing statutes. The preface to the rule states: "Scope of this Rule: This rule governs all matters relating to interstate and foreign commerce. The diversity of problems involved limits the rule to a statement of general principles and the Tax Commission reserves the right to rule upon each question as it arises." It is our view that the Tax Commission's position in this case is consistent with its interpretation reflected in Rule 193, and further, that the Tax Commission did not irrevocably bind itself to a particular interpretation by virtue of Rule 193.

tion involved in transactions which permeate state boundaries. We do not think it necessary to discuss in detail all of the authorities cited. It suffices to say that we are not persuaded that any case of the United States Supreme Court or of this court dictates the approach that presence or absence of a local office is *the* controlling factor. To allow tax immunity to those who direct business activities from a point just across the state line, regardless of the quantum and effect of local activity, would amount to a discrimination against those who have located offices within the state. And taxation of those who perform de minimus activities through a local office would be unreasonable and unjust.

Although location of an office within the state has been of assistance in characterizing the extent of operations and activities within a state (see *Norton Co. v. Department of Revenue* (1951), 340 U. S. 534, 95 L. Ed. 517, 71 S. Ct. 377; *Field Enterprises v. State* (1955), 47 Wn. (2d) 852, 289 P. (2d) 1010, *aff'd. per curiam*, 352 U. S. 806 (1956); *B. F. Goodrich Co. v. State* (1951), 38 Wn. (2d) 663, 231 P. (2d) 325, *cert. denied*, 342 U. S. 876 (1951)), the mere physical presence of an office within the state has never been the sole criterion for validating a state's assessment of a tax. Conversely, absence of a local office does not render the conclusion automatic that sufficient nexus to validate a tax is lacking. The essential inquiry must be directed to the amount and effect of the activities involved and not the form of the operations. See *Brown-Forman Distillers Corp. v. Collector of Revenue* (1958), 234 La. 651, 101 So. (2d) 70, *cert. denied*, 359 U. S. 28 (1959).

The fact that extensive manufacturing and operational activities of General Motors occur elsewhere has no bearing on the question before this court. The state is not attempting to tax those activities, but rather is seeking to tax business activity in Washington measured by wholesale sales to Washington dealers. Thus, considerations of other activities performed by General Motors are irrelevant to the question of taxable activity in relation to wholesaling transactions. We are considering here only the whole-

saling function and the effect of the activities of General Motors in Washington attributable to that function.

Although the facts reveal that General Motors' activities in this state are substantial, no local office is maintained in this state, except for the Class "A" Chevrolet office in Seattle. The activities involved are extensive promotional and service efforts. They pervade virtually every aspect of the retail dealer's operations. The General Motors field organization representatives are intimately associated with the retail dealers on matters pertaining to the dealers' accounting and business operational methods; the dealers' sales and service technique; the dealers' inventory of parts and accessories; the dealers' show-room and service facilities; and the dealers' used-car business. In addition to these tangible and directly-performed activities, other activities of a more subtle nature are engaged in within this state and in conjunction with dealers. General Motors' advertising is beamed in via television, exhibited by means of outdoor advertising, and distributed by way of newspapers and magazines. All of these activities are related to sales of General Motors in the sense that they tend to strengthen dealer representation and stimulate consumer demand. Because of the very nature of the activities, it cannot be said that General Motors directly participates in particular retail sales. Yet the activities undeniably have a very great effect in terms of increasing total retail sales in Washington, thereby increasing also wholesale sales. All of the transactions measured by the tax imposed on these activities are in some degree affected by General Motors' organized promotional efforts.

According to the rule of the *Norton* case, *supra,* reiterated by this court in the *Goodrich* case, *supra,* where extensive business activity occurs within a state, taxation can only be avoided upon a showing that the activities are disassociated from the sales in question. Therefore, it is incumbent upon General Motors to make a showing of disassociation or, at a minimum, some degree of disassociation in order to remove from taxation that portion of sales not attributable to that activity. This has not been done. Although the mechanical

aspects of the wholesale sales of General Motors to retail dealers occur outside of the state, the substance of each transaction occurs in Washington where the customer is located and where the demand for the manufactured product exists, in very large degree, as a result of General Motors promotional activities. *Field Enterprises v. State, supra*; cf. *Northwestern States Portland Cement Co. v. Minnesota* (1959), 358 U. S. 450, 3 L. Ed. (2d) 421, 79 S. Ct. 357, 67 A. L. R. (2d) 1292. The activities of General Motors in Washington in relation to these sales provide a sufficient nexus upon which to base the tax. Thus, the state is taxing only that which takes place within its borders, and measuring the tax by transactions which relate sufficiently to the activities in question to be within the requirements of the due process clause.

We turn now to an examination of commerce clause considerations.

◼ The primary considerations for determining the limits of a state's power to tax activities connected with interstate commerce are: (1) Whether the tax places an extra burden on interstate commerce not borne by intrastate commerce, or erects barriers, placing out-of-state businesses at a disadvantage; the discrimination test. (2) Whether the interstate commerce involved is subject to the risk of repeated exactions of the same nature from other states; the multiple burden test. *Washington-Oregon Shippers Co-op. Ass'n v. Schumacher* (1961), 59 Wn. (2d) 159, 367 P. (2d) 112; and cases cited therein.

◼ It is alleged that, by virtue of RCW 82.04.440,[3] Washington businesses engaged in intrastate commerce receive a commercial advantage; or, conversely stated, that discrimination against interstate commerce results. The alleged commercial advantage arises when an out-of-state manufacturer is compelled to pay the Washington wholesale tax and a manufacturing tax in another state, while the local producer pays only the wholesale tax. However, the

[3]RCW 82.04.440 in essence provides that goods manufactured and sold within the state of Washington are only subject to a wholesale tax.

advantage, if any, does not result from the Washington imposition of a wholesale tax, but rather from the failure of Washington to impose a tax on the manufacturing activities within its jurisdiction. The essence of this contention is that it is necessary for Washington to tax local manufacturers for the privilege of producing to the same extent that their competitors are subjected to taxation by other states. This is of course not only unnecessary, *B. F. Goodrich v. State, supra,* but is also impossible, since there is neither a uniform practice of taxation nor tax rates by states in reference to manufacturing activities within their jurisdictions. Furthermore, this contention does not validly attack the imposition of the wholesale tax, since it is based upon an activity separate and distinct from manufacturing.

The tax in question is applicable to all who engage, within the state, in the business of making sales at wholesale. It is only that local activity which is being subjected to taxation. And the tax is imposed equally upon all who participate in the same activity within the state. Those involved in interstate commerce are not forced to bear any burden not borne by those exclusively engaged in intrastate commerce, so it cannot be said that the tax is discriminatory. *Washington-Oregon Shippers, supra; B. F. Goodrich Co. v. State, supra.*

 It is also contended that the state's imposition of a tax on the local wholesaling activities of a company which manufactures its products outside the state subjects that company to multiple tax burdens not borne by those companies which both manufacture and wholesale within the state. (This contention is partially based upon RCW 82.04-.440, which has been previously discussed.) This contention of multiple-burden taxation was made in *B. F. Goodrich Co. v. State* (1951), 38 Wn. (2d) 663, 668, 231 P. (2d) 325; *cert. den.* 342 U. S. 876, and it was answered as follows:

" . . . Because some other state might exercise its undoubted right to tax the privilege of manufacture with respect to goods ultimately sold in Washington (*American Mfg. Co. v. St. Louis,* 250 U. S. 459, 63 L. Ed. 1084, 39 S. Ct. 522; see *Freeman v. Hewit,* 329 U. S. 249, 91 L. Ed. 265, 67 S.

Ct. 274), this state need not forego its right to tax the business of selling those goods. Each state must derive its revenues from what goes on within its own borders. And if Washington's statute exempts local manufacturers from paying their tax as manufacturers, providing they also pay it as sellers, that, as appellant admits, can be of no concern to one who manufactures out of the state.

"Appellant engages in but one local taxable activity—selling—and as to this it is now taxed on a parity with all others who engage in like activity here. . . ."

We adhere to this position.

The tax is imposed upon business activity within the state. The measure of the tax is the proceeds from the sales attributable to that activity. No part of the tax is attributed to manufacturing or other activities taking place outside of the state. *Crown Zellerbach Corp. v. State*, 53 Wn. (2d) 813, 328 P. (2d) 884; *cert. denied*, 359 U. S. 531 (1958); *United States Steel Corp. v. State* (1957), 51 Wn. (2d) 224, 316 P. (2d) 1099. The fact that some other incident occurs elsewhere rendering General Motors liable for a different tax in another state does not mean that multiple burdens are occasioned as a result of the Washington tax, because repeated exactions of the same nature do not occur. *B. F. Goodrich Co. v. State*, *supra*. We hold that the tax in question is not violative of the commerce clause.

The statements heretofore made in relation to the validity of the tax measured by the gross receipts from Chevrolet Class "B" sales and Pontiac, Oldsmobile, and General Motors Parts Divisions sales are for the most part applicable and dispositive of the questions raised by the cross-appeal. Not only are the same extensive promotional and service efforts performed in connection with Chevrolet Class "A" sales to retail dealers, but additional activities were undertaken by the Seattle branch office to expedite delivery. A fortiori, taxes measured by these transactions were validly assessed.

With respect to the question raised concerning sales and returns of obsolete parts, the following is dispositive. The pertinent contractual provisions relating to the return of parts read as follows:

"5. A. During the months of August, September or October of each year, . . . Dealer may return to Chevrolet one shipment of new, unused and undamaged Chevrolet (C & CX) parts purchased from Chevrolet, or purchased from an outgoing Chevrolet dealer as part of Dealer's initial Chevrolet parts stock, for a maximum credit value not to exceed four per cent (4%) of Dealer's net purchases of such parts, excluding batteries and electrolyte, during the previous fiscal year beginning July 1 and ending June 30.

"B. The return of such parts shall be subject to the following conditions:

"(1) Only those Chevrolet (C & CX) parts will be eligible for return hereunder which were listed for service in any of the Chevrolet Dealers Parts and Accessories Price Schedules which were in effect during the current and two preceding fiscal years. Chevrolet will credit Dealer's account for such eligible return parts with the Dealer Net Prices therefor in effect at the time such parts are received by Chevrolet. . . ."

General Motors contends that returned parts transactions are rescinded sales rather than repurchases and, therefore, excludable from the gross proceeds of sales of products by General Motors to Chevrolet Class "A" retail dealers.

██ It will be observed that contract provisions specify that dealers receive credit for returns in accordance with prices in effect at the time of the return rather than those in effect at the time of the original purchase. Thus, it is evident that the transactions are in fact repurchases and not rescinded sales. Furthermore, General Motors' contention is based upon the assumption that sales of parts are never final until the specific part is no longer returnable. We do not so interpret the contractual provisions. Accordingly, the trial court was, in our opinion, correct in its conclusion that sales of these items were final, and that returned items were repurchased.

The decision of the trial court is hereby reversed with respect to the appeal initiated by the Tax Commission, and affirmed with respect to the cross-appeal initiated by General Motors.

HILL, DONWORTH, WEAVER, ROSELLINI, OTT, HUNTER, and HAMILTON, JJ., concur.