22724. UNITED STATES STEEL CORPORATION v. UNDERCOFLER, State Revenue Commissioner.

ARGUED NOVEMBER 10, 1964—DECIDED JANUARY 7, 1965— REHEARING DENIED FEBRUARY 4, 1965.

*John Izard, William K. Meadow, King & Spalding,* for plaintiff in error.

*Eugene Cook, Attorney General, John E. Dean, Assistant Attorney General,* contra.

ALMAND, Justice. The statement by counsel for the plaintiff in error of the facts in this case is so fair and accurate that we adopt it as our statement of the facts:

United States Steel Corporation, plaintiff in error (hereinafter referred to as the taxpayer), filed this suit in the Superior Court of Fulton County against the State Revenue Commissioner, defendant in error (hereinafter referred to as the Commissioner), alleging that the amounts of income tax collected from taxpayer for the years 1953 and 1954 were excessive because: (1) the Commissioner had erroneously construed the income tax statute; (2) as applied to taxpayer, a portion of the income tax statute (*Code Ann.* § 92-3113 (c)) was unconstitutional as violative of the due process clauses of the Georgia and Federal Constitutions and the commerce clause of the Federal Constitution.

After a trial in the superior court, both parties having waived a jury, the court entered judgment for the taxpayer in the full amount at issue.

The Commissioner filed a bill of exceptions to the Supreme Court. Since it did not appear that the trial court had necessarily passed on the constitutionality of any statute, this court transferred the bill of exceptions to the Court of Appeals. 219 Ga. 264 (133 SE2d 11).

The Court of Appeals noted: "In the light of the Supreme Court's decision transferring the case here and the jurisdictional limitations of this court, only a question of statutory interpretation is presented." The Court of Appeals then held that the Commissioner had properly interpreted the statute and set aside the judgment of the trial court. 109 Ga. App. 8 (135 SE2d 69).

In accordance with a stipulation of the parties, the case was again submitted to the superior court upon the record made at the first trial. The superior court held against the taxpayer on each and every ground set forth in the petition and entered

judgment for the Commissioner. Taxpayer thereupon filed its bill of exceptions to this court.

The stipulation of the parties was as follows:

"1. Plaintiff is a non-resident corporation, having its principal place of business in Georgia at 1375 Peachtree Road, Atlanta, Fulton County, Georgia. The Superior Court of Fulton County, Georgia has jurisdiction of this action.

"2. The net income of United States Steel Corporation (hereinafter referred to as U.S. Steel), determined in accordance with Georgia Income Tax Act, as amended, for the calendar year 1953 was $419,617,926.13, and for the calendar year 1954 was $342,730,138.62.

"3. U.S. Steel was engaged in the steel business. Its business activities included the mining and purchase of raw materials, the manufacture of steel products, the sale of products, the performance of construction contracts, research and other activities carried on by an integrated steel company. U.S. Steel carried on its business at many locations in the United States and Canada. U.S. Steel had approximately 300,000 employees.

"4. U.S. Steel's board of directors and chief executive officers carried on their activities principally in Pittsburgh, Pennsylvania and New York, New York. Overall company policy was set by these directors and officers. None of these directors or officers were present in Georgia in connection with the business of U.S. Steel.

"5. U.S. Steel's business activities were carried on by fourteen divisions. Except for overall policy set by the directors and officers described in Paragraph 4, each division was managed as though it were a separate company. The management of each division was responsible for purchasing, manufacturing, sales, accounting and all other activities. The activities of each division were separate and distinct from the activities of other divisions.

"Most of the divisions, including TCI, as well as U.S. Steel, conducted national and local advertising. In such advertising, each division generally identified itself as a division of U.S. Steel.

"6. U.S. Steel's activities in Georgia were as follows:

"(a) Gerrard Steel Strapping Division rented strapping machines to Georgia customers.

"(b) American Bridge Division maintained a contracting office in Atlanta, Georgia. It had four permanent employees, who resided in Georgia. It owned office furniture and fixtures. Construction equipment used in the performance of specific construction contracts was moved into Georgia from time to time from storage depots located outside of Georgia. Erecting crews were customarily hired through local union hiring halls to the extent possible.

"The operations of American Bridge within Georgia consisted of the solicitation of fabricated structural steel sales contracts and the negotiation and performance of construction contracts.

"(c) American Steel and Wire Division (hereinafter referred to as American Wire) owned a warehouse building in Savannah, Georgia. It maintained an office in that building. It had approximately twenty employees there. These employees included a District Manager, Fence Erection Superintendent, Fence Erection Foreman, Warehouse Foreman, five warehousemen and eleven clerical employees. It owned the products stored in the warehouse, automobiles, light trucks, office furniture and fixtures. Itinerant crews were employed to perform erection services.

"In addition, American Wire maintained an office in Atlanta, Georgia. Two salesmen and two Erection Foremen were employed there. It owned the office furniture and fixtures in that office.

"The operations of American Wire in Georgia consisted of the solicitation and acceptance of orders for steel fencing and other 'cyclone' steel products; negotiating and accepting contracts for the erection of fencing; and installing fencing.

"(d) National Tube Division maintained an office in Atlanta, Georgia. It had approximately ten employees there. These employees included a Manager of Sales, Office Manager, Salesman and seven clerks and secretarial workers. It owned office furniture, fixtures and three or four automobiles.

"The operations of National Tube in Georgia consisted of the solicitation and negotiation of orders for pipe and the sale of pipe.

"The activities described in Subparagraphs (a), (b), (c) and (d) above, the activities of Tennessee Coal and Iron Division described in Paragraph 7 and occasional trips to Georgia by

other U.S. Steel personnel were the only activities carried on in Georgia by U.S. Steel involving the presence in Georgia of any of U.S. Steel's employees or property.

"7. Tennessee Coal and Iron Division (hereinafter referred to as TCI) maintained no offices within the State of Georgia. It maintained small consigned stocks of goods (principally wire rope and cotton ties) at a few locations in Georgia. Sales from these stocks in 1953 amounted to $50,931.14, and in 1954 to $87,878.28.

"TCI's sales department was located in Birmingham. It had approximately three hundred employees.

"In addition, TCI employed forty-nine outside salesmen; three or four of these salesmen were residents of Georgia and spent the majority of their time in Georgia. These salesmen called periodically on all of TCI's customers in Georgia except the customers solicited outside of Georgia from whom the receipts described . . . [below] arose.

"Ordinarily, two men and one secretary in the Birmingham office were directly assigned to each outside salesman. These back-up people telephoned, telegraphed and wrote to customers in Georgia, but rarely, if ever, were present in Georgia. The remaining one hundred fifty employees of the Birmingham sales department backed up the sales force generally. They included managers in charge of pricing, distribution, advertising, marketing plans and other functions. They rarely had occasion to be present in Georgia.

"Purchasers ordinarily buy steel on a repetitive basis, and TCI's minimum order was ordinarily a carload lot. The great bulk of its business from Georgia customers grew out of orders which were mailed, telephoned or telegraphed directly by the customer to TCI's sales department in Birmingham. The customer's purchase orders were subject to acceptance or rejection in Birmingham.

"In 1953 and 1954, steel production in the Southeast was inadequate to meet the demand. TCI's customers were on quotas and substantially all of its production was immediately placed.

"TCI's mines and steel mills were located in Birmingham, Alabama, where it employed twenty-five thousand people."

The taxpayer introduced detailed evidence about the $9,000,-000 of gross receipts at issue in this case.

Approximately $1,500,000 of those gross receipts arose from shipments of tinplate to American Can Company. J. Ernest Hill testified that the purchasing department of American Can Company was located in New York City. Taxpayer's Tennessee Coal and Iron Division shipped tinplate to American Can at approximately twenty-five locations, only one of which was in Georgia. Overall contracts for these shipments were negotiated in New York. At the time of making such contracts of sale, TCI had no actual orders for tinplate. Thereafter, American Can sent orders for the tinplate by mail to TCI in Birmingham. Still, TCI did not ordinarily have any shipping instructions. Generally, TCI did not learn that tinplate was to be shipped to Savannah, Georgia, until the tinplate was in production.

TCI sales people did not call on American Can Company in Georgia.

Approximately $3,300,000 of those gross receipts arose from shipments of rails and other products to railroads. L. R. Carpenter testified that TCI shipped rails and track accessories to Georgia for six railroad customers who had their general offices where their engineering and purchasing departments were located. Ordinarily TCI solicited a contract for a railroad's annual requirements. The railroad mailed the contract to TCI in Birmingham. Shipping instructions were sent to TCI in Birmingham from time to time during the year.

Title to almost all rail shipments passed to the railroads at TCI's mill in Birmingham.

TCI did not know whether or not rails reached their destination or whether or not rails were used at their destination. In a number of instances, rails were not used at the destination to which they were shipped.

Railroads with general offices outside of Georgia were never contacted in Georgia by TCI salesmen. Collection problems were handled through the railroad's general offices.

TCI's advertising of rail products was limited to a "very small" amount of national trade magazine advertising.

With respect to the remaining gross receipts making up the

$9,000,000 per year, Mr. Carpenter testified that they were handled in substantially the same manner as sales to railroads.

The taxpayer makes no complaint as to the constitutionality or the application of ratios (a) and (b) of the Three Factor Ratio of *Code Ann.* § 92-3113 (4) (Ga. L. 1950, pp. 299, 301-03). The question for decision is whether or not the Commissioner, by assessing the Georgia income tax on a large portion of the taxpayer's income has exceeded constitutional limitations.

The plaintiff in error has accurately stated the two issues involved:

"1. Does the inclusion of $9,000,000 of gross receipts from such sales in the numerator of the gross receipts ratio as provided by statute and the resulting substantial increase in the portion of the Taxpayer's income which is subject to taxation in Georgia violate the Due Process Clause of the State or Federal Constitution? Does the portion of the statute which so provides violate those clauses?

"2. Does the inclusion of $9,000,000 of gross receipts from such sales in the numerator of the gross receipts ratio as provided by statute and the resulting substantial increase in the portion of Taxpayer's income which is subject to taxation in Georgia violate the Commerce Clause of the Federal Constitution? Does the portion of the statute which so provides violate the Commerce Clause?"

The taxpayer insists that the record shows that the State of Georgia is taxing activities which take place beyond its boundaries and the use of the gross receipts ratio to substantially increase its tax liability to Georgia results in an unreasonable application of the formula to the taxpayer.

The Commissioner's contention is that the taxpayer was doing business in Georgia during the year in question, and not electing to pursue the methods of separate accounting as provided by *Code* §§ 92-3114 and 92-3115, it is subject to apportionment as provided by *Code Ann.* § 92-3113 (4), and that the taxpayer has failed to establish either the invalidity of this formula or the application of the formula to it as being unreasonable.

The Three Factor Ratio for the allocation and apportionment of corporate income attributable to property owned or business

done within the State of Georgia was adopted in 1950 (Ga. L. 1950, p. 299). This Act, which amended Ch. 92-31 of the Georgia Code of 1933, provides in part:

"(4) Where income is derived from the manufacture, production, or sale of tangible personal property, the portion of the net income therefrom attributable to property owned or business done within this State shall be taken to be the portion arrived at by application of the following:

"Three Factor Ratio:

"(a) Average inventory ratio.—The ratio of the average of the monthly inventories of all products held in this State for sale, lease or other distribution or use in connection with the trade or business of the taxpayer during the taxable year to the average of the total monthly inventories of all products held everywhere for sale, lease or other distribution in connection with the trade or business of the taxpayer. The term 'products' shall include goods, wares and merchandise of every character and kind, whether owned by the taxpayer or held on consignment or otherwise, but shall not include unrecovered or unextracted natural resources, raw materials, or goods in process of manufacture.

"If the taxpayer shall fail to keep its records so as to disclose the information necessary to apply the foregoing ratio, the Commissioner shall determine the same from such information as may be available.

"(b) Salaries and wages ratio.—The ratio of all salaries, wages, commissions, and other compensation paid or incurred by the taxpayer in this State for services performed in connection with the trade or business of the taxpayer during the taxable year to the total salaries, wages, commissions, and other compensation paid or incurred by the taxpayer in connection with its entire trade or business, wherever conducted, during the taxable year. For the purposes of this section, all salaries, wages, commissions and other compensation paid to residents of Georgia shall be deemed to have been paid or incurred in this State, irrespective of the place of actual payment.

"(c) Gross receipts ratio.—The ratio of gross receipts from business done within this State to total gross receipts from busi-

ness done everywhere. For the purposes of this section receipts shall be deemed to have been derived from business done within this State only if received from products shipped to customers in this State, or delivered within this State to customers, and in determining the gross receipts within Georgia, receipts from sales negotiated or effected through offices of the taxpayer outside the State and delivered from storage in the State to customers outside the State shall be excluded.

"(d) The average inventory ratio, the salaries and wages ratio, and the gross receipts ratio shall be separately determined and the three percentages averaged, and the net income of the corporation allocated and apportioned to Georgia according to such average."

The (a) average inventory ratio and the (b) wages and salary ratio are not here involved.

This amended Act of 1950 was challenged as a whole as being violative of the due process clause of the Georgia Constitution in *Owens-Illinois Glass Co. v. Oxford*, 216 Ga. 316 (116 SE2d 293). In a unanimous decision it was held that the Act as a whole did not deny due process to the taxpayer. No specific attack was made on the gross receipts formula or the reasonableness of the same to the taxpayer. In *Oxford v. Nehi Corp.*, 215 Ga. 74 (109 SE2d 329), no question was raised or decided as to the validity or reasonableness of the gross receipts formula. We there dealt only with the meaning and effect of the "gross receipts ratio."

Nor was the validity or the reasonableness of the apportionment of net income to Georgia under the Three Factor Ratio determined in *Stockham Valves & Fittings, Inc. v. Williams*, 213 Ga. 713 (101 SE2d 197), rev. 358 U.S. 450 (79 SC 357, 3 LE2d 421).

We are called upon for the first time to determine whether the gross receipts ratio by its terms or the application to the taxpayer on the specific facts of this case is violative of the due process clauses of the Georgia and Federal Constitutions and of the commerce clause of the Federal Constitution.

Georgia, in adopting the gross receipts ratio in the apportionment of income earned by the production and sale of tangible

personal property, has used what is called by economists "the destination-of-goods theory," which is also known as the theory of the "place of the market." This is a part of the theory that income is earned at the situs of the customer and not where the goods are produced. For a discussion of these tax "theories" see: 46 A. B. J. 369, 375, 526; 73 Harvard L. R. 170; 12 Vanderbilt L. R. 904.

The taxpayer insists that none of its activities in Georgia relate in any way to the $9,000,000 of gross receipts for goods shipped to Georgia to unsolicited customers in Georgia where the sales were negotiated, consummated and produced outside of Georgia.

In the last analysis the question for decision is: do the facts showing (a) that the taxpayer and its subsidiaries maintain offices and employees in the State of Georgia for the solicitation of orders and sales of its products and the promotion of its business; (b) the sale and delivery of unsolicited orders to customers in Georgia of its products produced outside of Georgia and (c) the receipt of the purchase price from its Georgia customers outside of Georgia, constitute such activities to form a sufficient nexus between the apportionment tax formula and transactions within the State for which the tax is exacted?

New York v. Graves, 299 U.S. 366 (57 SC 237, 81 LE 285), involved the constitutional validity of a tax imposed by the State of New York upon the profits realized by a nonresident upon the sale of an appointment to membership on the New York Stock Exchange. In upholding the tax the court held: "An intangible property right may have a 'business situs' in a State for tax purposes either because the right grows out of the actual transactions of a business there localized, or because its exercise is fixed there, exclusively or dominantly."

It was held in Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113 (3) (41 SC 45, 65 LE 165): "A state tax upon the income of a sister-state corporation manufacturing its product within the State but deriving the greater part of its receipts from sales outside the State, which attributes to processes conducted within the State the proportion of the total net income which the value of real and tangible personal property owned by

the corporation within the State bears to the value of all its real and tangible personal property, is not inherently unreasonable and calculated to tax income earned beyond the borders of the State; and, unless it be shown to be so in its application to the particular case, cannot be held to violate the due process clause of the Fourteenth Amendment."

It was said in Hans Rees' Sons, Inc. v. North Carolina, 283 U. S. 123, 133 (51 SC 385, 75 LE 879): "Undoubtedly, the enterprise of a corporation which manufactures and sells its manufactured product is ordinarily a unitary business, and all the factors in that enterprise are essential to the realization of profits. The difficulty of making an exact apportionment is apparent and hence, when the State has adopted a method not intrinsically arbitrary, it will be sustained until proof is offered of an unreasonable and arbitrary application in particular cases."

In the Stockham Valves case, 358 U. S. 450 (2e) (79 SC 357, 3 LE2d 421), the court held: "The taxes here involved do not violate the Due Process Clause, since they are levied only on that portion of the taxpayer's net income which arises from its activities within the taxing State and those activities form a sufficient 'nexus' to satisfy due process requirements."

Again in Bass, Ratcliff & Gretton, Ltd. v. State Tax Commission, 266 U. S. 271, 282 (45 SC 82, 69 LE 282), the court said: "So in the present case we are of opinion that, as the company carried on the unitary business of manufacturing and selling ale, in which its profits were earned by a series of transactions beginning with the manufacture in England and ending in sales in New York and other places—*the process of manufacturing resulting in no profits until it ends in sales*—the State was justified in attributing to New York a just proportion of the profits earned by the company from such unitary business." (Emphasis supplied.)

The Supreme Court in Wisconsin v. J. C. Penny Co., 311 U. S. 435, 444 (61 SC 246, 85 LE 267), said: "The Constitution is not a formulary. It does not demand of states strict observance of rigid categories nor precision of technical phrasing in their exercise of the most basic power of government, that of taxation. For constitutional purposes the decisive issue turns on the oper-

ating incidence of a challenged tax. A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society.

"Constitutional provisions are often so glossed over with commentary that imperceptibly we tend to construe the commentary rather than the text. We cannot, however, be too often reminded that the limits on the otherwise autonomous powers of the states are those in the Constitution and not verbal weapons imported into it. 'Taxable event', 'jurisdiction to tax', 'business situs', 'extraterritoriality', are all compendious ways of implying the impotence of state power because state power has nothing on which to operate. These tags are not instruments of adjudication but statements of result in applying the sole constitutional test for a case like the present one. That test is whether property was taken without due process of law, or, if paraphrase we must, whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return. The substantial privilege of carrying on business in Wisconsin, which has here been given, clearly supports the tax, and the state has not given the less merely because it has conditioned the demand of the exaction upon happenings outside its own borders. The fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction."

The opinion of this court in *Owens-Illinois Glass Co. v. Oxford*, 216 Ga. 316, 322 (116 SE2d 293), contains the following statement: " 'The exploitation of the market for the capture of profits, along with the protection afforded by the state of the market during the process, were enough for the state to demand something in return, thus satisfying the requirements of due process.' "

In our opinion the "gross receipts ratio" (*Code Ann.* § 92-3113 (4c)), in view of (a) the average inventory ratio and (b) the

salaries and wages ratio of the Three Factor Ratio, is not unreasonable on its face or in its application to the taxpayer in the instant case so as to be violative of the taxpayer's rights under the due process clause of either the Federal or the Georgia Constitution.   In its shipment of its products from outside Georgia, though the sales were negotiated and consummated outside of Georgia and the goods sold were produced out of the State, the income earned from the sale of the products was not at the *place* where the *sale* was made or where the goods were *manufactured* or the *point* from which the shipment was made.   The income was earned when the Georgia customers received the products and paid for them.   The State of Georgia not only provided the taxpayer's customers, it also provided the railroads and highways for the shipment of the products to the Georgia customers.   The taxpayer maintained offices in Georgia for the promotion of its business, the sale of its products, and assistance to its customers.   If the customers failed or refused to pay for its products, the courts of Georgia would be open and available to the taxpayer to enforce payment.   It is the receipt of money or other things of value from the sale of such products to customers that produces income.   As was said in Bass, Ratcliff & Gretton, Ltd. v. State Tax Commission, 266 U. S. 271, 282, supra, "the process of manufacturing [results] in no profits until it ends in sales."

We are of the opinion that the business activities of the taxpayer and its subsidiary corporate agents in Georgia were related to and connected with the sales and delivery of its products to Georgia customers from which the gross receipts here involved arose.   The taxpayer maintained an office and place of business in Atlanta.   The taxpayer was engaged in the steel business.   Its business activities were: the manufacture of steel products, the sale of its products, the performance of construction contracts, research and other activities carried on by an integrated steel company.   Its business was carried on by 14 divisions.   Most of the divisions, including Tennessee Coal & Iron Company, as well as the taxpayer, conducted national and local advertising.   The operations of the American Bridge Division consisted of the solicitation of prefabricated steel sales contracts

and the negotiation and performance of construction contracts. The steel and wire division maintained an office in Savannah and in Atlanta. Its operations in Georgia consisted of the solicitation and acceptance of orders of steel fencing and contracts for the erection of fences. The National Tube Division maintained an office in Atlanta. Its operations consisted of the solicitation and negotiation of orders for pipe in Georgia. The Tennessee Coal & Iron Division, though not maintaining an office in Georgia, maintained small consigned stock in the State. Its sales department was in Birmingham, Ala. Three or four of its salesmen were residents of Georgia and called on its customers in Georgia except the customers solicited outside of Georgia from whom the receipts here involved were derived. The great bulk of its business from Georgia customers grew out of orders which were mailed, telephoned or telegraphed directly to its sales department in Birmingham.

In reaching the conclusion that the gross receipts ratio factor of the Georgia Income Tax Statute in its application to the taxpayer under the facts of this case does not deny the taxpayer due process under the due process clause of the Federal Constitution or the Georgia Constitution or under the commerce clause of the Federal Constitution we are supported (narrowly by the vote of one Justice, but nevertheless, as of today, a binding authority) by the decision of the Supreme Court of the United States in the case of General Motors Corp. v. Washington, 377 U. S. 436 (84 SC 1564, 12 LE2d 430), decided June 8, 1964, rehearing denied 379 U. S. 875 (85 SC 14). The court there had under consideration a statute of the State of Washington which levied a tax for the act or privilege of engaging in business activity in the State, to be measured by the application of rates against value of products, gross proceeds of sales or gross income of the business. For the tax year in question General Motors Corporation was engaged in business in the State of Washington through its Chevrolet, Pontiac and Oldsmobile Divisions and through General Motors Parts. The corporation manufactured and sold motor vehicles in States other than Washington and sold them to its dealers and independent dealers in Washington. General Motors, in order to carry out

its sales, maintained a sales organization in Washington to promote programs, plans and for assistance to its dealers. The State asserted the right to tax the receipts from sales to independent dealers in Washington where such sales were not the result of direct solicitation of agents of General Motors, but were based upon orders sent by the independent dealers to the office of General Motors Corporation in Portland, Ore., where they were accepted for shipment f.o.b. from points outside of Washington. Whether or not such receipts were subject to the State's tax depended upon the question of whether the other business activities of General Motors through its subsidiaries in Washington had any direct relation to the sale of its products to independent dealers. The Supreme Court of Washington (General Motors Corporation v. State, 60 Wash. 2d 862, 376 P2d 843) upheld the assessment against the attack that it violated the due process and commerce clauses of the Federal Constitution. In its opinion (p. 872) it said: "General Motors accomplishes wholesale sales of its products to retail dealers within the state. Part of the activities involved in these wholesale sales take place elsewhere; e.g., orders are filled, delivery made, and payment is received outside of the state. Nonetheless, business activities having a relation to wholesale sales are conducted in Washington. These activities provide an incident upon which the taxing statute operates." "Although the mechanical aspects of the wholesale sales of General Motors to retail dealers occur outside of the state, the substance of each transaction occurs in Washington where the customer is located and where the demand for the manufactured product exists, in very large degree, as a result of General Motors promotional activities [in Washington]." P. 875.

Mr. Justice Clark, speaking for a majority of the court, in affirming the judgment of the Supreme Court of Washington as to whether the business activities of General Motors in the State of Washington were sufficient incidents for the levy of a tax that did not violate constitutional provisions, said: "But these divisions had district managers, service representatives and other employees who were residents of the State and who performed substantial services in relation to General Motors' functions

therein, particularly with relation to the establishment and maintenance of sales, upon which the tax was measured. We place little weight on the fact that these divisions had no formal offices in the State, since in actuality the homes of these officials were used as corporate offices. Despite their label as 'homes' they served the corporation just as effectively as 'offices'. In addition, the corporation had a Chevrolet branch office and a General Motors Parts Division warehouse in Seattle.

"Thus, in the bundle of corporate activity, which is the test here, we see General Motors activity so enmeshed in local connections that it voluntarily paid taxes on various of its operations but insists that it was not liable on others. Since General Motors elected to enter the State in this fashion, we cannot say that the Supreme Court of Washington erred in holding that these local incidents were sufficient to form the basis for the levy of a tax that would not run contrary to the Constitution." (P. 447). "Here, just as in Norton, the corporation so mingled its taxable business with that which it claims nontaxable that we can only 'conclude that, in the light of all the evidence, the judgment attributing . . . [the corporation's Washington sales to its local activity] was within the realm of permissible judgment. Petitioner has not established that such services as were rendered . . . [through in-state activity] were not decisive factors in establishing and holding this market.' Ibid. Although mere entry into a State does not take from a corporation the right to continue to do an interstate business with tax immunity, it does not follow that the corporation can channel its operations through such a maze of local connections as does General Motors, and take advantage of its gain on domesticity, and still maintain that same degree of immunity." (P. 448).

We cannot say that the gross receipts ratio when taken in connection with the two other factors of the Three Factor Ratio and the provisions of the statute (*Code Ann.* § 92-3113 (4d): "The average inventory ratio, the salaries and wages ratio, and the gross receipts ratio shall be separately determined and the three percentages averaged, and the net income of the corporation allocated and apportioned to Georgia according to such average.") violates the due process clause of the Federal Constitution or the due process clause of the Georgia Constitution.

We agree to the conclusion reached by the Court of Appeals when the instant case was before it when it said: "An additional consideration that may well have prompted the General Assembly to adopt the gross receipts or destination of the goods as an element in the Three Factor Ratio is that the taxpayer is free to vary other incidents of sales such as the solicitation of orders, the working out of credit arrangements, the keeping of accounts and records and the collection of accounts, so that they may occur at places beyond the State, but it is difficult and generally not possible to get the Georgia customer's business unless the goods are shipped to him here. The destination of the goods can not generally be varied. Consequently the relationship of Taxpayer's business to the Georgia market for its product can largely be established by the receipts from goods sent to customers in Georgia. This, together with the other factors used in arriving at a basis for allocation of income seems fair to us and we should find nothing unreasonable about it as a proper interpretation of the statute even if we did not find that it must follow from the interpretation in the converse situation of *Oxford v. Nehi Corp.*, 215 Ga. 74, supra." *Undercofler v. U. S. Steel Corp.*, 109 Ga. App. 8, 12-13, supra.

Having held that the income had a taxable state situs under the tax formula, whether such income arose by reason of interstate commerce is immaterial, there being no discrimination against interstate commerce either in the measurement of the tax or in means of enforcing it. *State Revenue Commission v. Edgar Bros. Co.*, 185 Ga. 216 (2) (194 SE 505) (appeal dismissed 303 U. S. 626); *Colgate-Palmolive-Peet Co. v. Davis*, 196 Ga. 681 (27 SE2d 326); Stockham Valves & Fittings, Inc. v. Williams, 358 U. S. 450 (2e), supra; Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, supra.

The judgment in favor of the Commissioner, on each and every ground is

*Affirmed. All the Justices concur, except Duckworth, C. J., who dissents.*