Mr. Justice Clark:
delivered the opinion of the Court.
This appeal tests the constitutional validity, under the Commerce and Due Process Clauses, of Washington’s tax imposed upon the privilege of engaging in business activities within the State.[1] The tax is measured by the *570 appellant’s gross wholesale sales of motor vehicles, parts and accessories delivered in the State. Appellant claims that the tax is levied on unapportioned gross receipts from such sales and is, therefore, a tax on the privilege of engaging in interstate commerce; is inherently discriminatory; results in the imposition of a multiple tax burden; and is a deprivation of property without due process of law. The Washington Superior Court held that the presence of a branch office in Seattle rendered some of the Chevrolet transactions subject to tax, but, as to the remainder, held that the application of the statute would be repugnant to the Commerce and the Due Process Clauses of the United States Constitution. On appeal, the Supreme Court of Washington reversed the latter finding, holding that all of the appellant’s transactions were sub *571 ject to the tax on the ground that the tax bore a reasonable relation to the appellant’s activities within the State. 60 Wash. 2d 862, 376 P. 2d 843. Probable jurisdiction was noted. 374 U. S. 824. We have concluded that the tax is levied on the incidents of a substantial local business in Washington and is constitutionally valid and, therefore, affirm the judgment.
I.
We start with the proposition that “[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business.” Western Live Stock v. Bureau of Revenue, 303 U. S. 250, 254 (1938). “Even interstate business must pay its way,” Postal Telegraph-Cable Co. v. Richmond, 249 U. S. 252, 259 (1919), as is evidenced by numerous opinions of this Court. For example, the Court has approved property taxes on the instruments employed in commerce, Western Union Telegraph Co. v. Attorney General, 125 U. S. 530 (1888); on property devoted to interstate transportation fairly apportioned to its use within the State, Pullman’s Palace Car Co. v. Pennsylvania, 141 U. S. 18 (1891); on profits derived from foreign or interstate commerce by way of a net income tax, William E. Peck & Co. v. Lowe, 247 U. S. 165 (1918), and United States Glue Co. v. Oak Creek, 247 U. S. 321 (1918); by franchise taxes, measured by the net income of a commercially domiciled corporation from interstate commerce attributable to business done in the State and fairly apportioned, Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113 (1920); by a franchise tax measured on a proportional formula on profits of a unitary business manufacturing and selling ale, “the process of manufacturing resulting in no profits until it ends in sales,” Bass, Ratcliff & Gretton, Ltd., v. State Tax Comm’n, 266 U. S. 271, 282 (1924); by a personal prop *572 erty tax by a domiciliary State on a fleet of airplanes whose home port was in the taxing State, despite the fact that personal property taxes were paid on part of the fleet in other States, Northwest Airlines, Inc., v. Minnesota, 322 U. S. 292 (1944); by a net income tax on revenues derived from interstate commerce where fairly apportioned to business activities within the State, Northwestern States Portland Cement Co. v. Minnesota, 358 U. S. 450 (1959); and by a franchise tax levied on an express company, in lieu of taxes upon intangibles or rolling stock, measured by gross receipts, fairly apportioned, and derived from transportation within the State, Railway Express Agency, Inc., v. Virginia, 358 U. S. 434 (1959).
However, local taxes measured by gross receipts from interstate commerce have not always fared as well. Because every State has equal rights when taxing the commerce it touches, there exists the danger that such taxes can impose cumulative burdens upon interstate transactions which are not presented to local commerce. Cf. Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U. S. 157, 170 (1954); Philadelphia & Southern S. S. Co. v. Pennsylvania, 122 U. S. 326, 346 (1887). Such burdens would destroy interstate commerce and encourage the re-erection of those trade barriers which made the Commerce Clause necessary. Cf. Baldwin v. G. A. F. Seelig, Inc., 294 U. S. 511, 521-522 (1935). And in this connection, we have specifically held that interstate commerce cannot be subjected to the burden of “multiple taxation.” Michigan-Wisconsin Pipe Line Co. v. Calvert, supra, at 170. Nevertheless, as we have seen, it is well established that taxation measured by gross receipts is constitutionally proper if it is fairly apportioned.
A careful analysis of the cases in this field teaches that the validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation. *573 For our purposes the decisive issue turns on the operating incidence of the tax. In other words, the question is whether the State has exerted its power in proper proportion to appellant’s activities within the State and to appellant’s consequent enjoyment of the opportunities and protections which the State has afforded. Where, as in the instant case, the taxing State is not the domiciliary State, we look to the taxpayer’s business activities within the State, i. e., the local incidents, to determine if the gross receipts from sales therein may be fairly related to those activities. As was said in Wisconsin v. J. C. Penney Co., 311 U. S. 435, 444 (1940), “[t]he simple but controlling question is whether the state has given anything for which it can ask return.”
Here it is admitted that General Motors has entered the State and engaged in activities therein. In fact, General Motors voluntarily pays considerable taxes on its Washington operations but contests the validity of the tax levy on four of its Divisions, Chevrolet, Pontiac, Oldsmobile and General Motors Parts. Under these circumstances appellant has the burden of showing that the operations of these divisions in the State are “dissociated from the local business and interstate in nature. The general rule, applicable here, is that a taxpayer claiming immunity from a tax has the burden of establishing his exemption.” Norton Co. v. Department of Revenue, 340 U. S. 534, 537 (1951). And, as we also said in that case, this burden is not met
“by showing a fair difference of opinion which as an original matter might be decided differently. This corporation, by submitting itself to the taxing power ... [of the State], likewise submitted itself to its judicial power to construe and apply its taxing statute insofar as it keeps within constitutional bounds. Of course, in constitutional cases, we have power to examine the whole record to arrive at an *574 independent judgment as to whether constitutional rights have been invaded, but that does not mean that we will re-examine, as a court of first instance, findings of fact supported by substantial evidence.” At 537-538.
With these principles in mind, we turn to the facts.
II.
1. General Motors’ Corporate Organization and Sales Operation.
General Motors is a Delaware corporation which was engaged in business in Washington during the period of time involved in this case, January 1, 1949, through June 30, 1953. Chevrolet, Pontiac, Oldsmobile and General Motors Parts are divisions of General Motors, but they operate substantially independently of each other. The corporation manufactures automobiles, trucks and other merchandise which are sold to dealers in Washington. However, all of these articles are manufactured in other States. In order to carry on the sale, in Washington, of the products of Chevrolet, Pontiac, Oldsmobile and General Motors Parts, the corporation maintains an organization of employees in each of these divisions on a national, regional and district level. During the taxing period in question, the State of Washington was located in the western region of the corporation’s national organization and each division, except General Motors Parts, maintained a zone office at Portland, Oregon. These zone offices serviced General Motors’ operations in Oregon, Washington, Idaho, portions of Montana and Wyoming and all of the then Territory of Alaska. Chevrolet Division also maintained a branch office at Seattle which was under the jurisdiction of the Portland zone office and which rendered special service to all except the nine southern counties of Washington, which were still serviced by the Portland office. The zone offices of each divi *575 sion were broken down into geographical district offices and it is in these districts that the dealers, to whom the corporation sold its products for re-sale, were selected and located.[2] The orders for these products were sent by the dealers to the zone office located at Portland. They were accepted or rejected there or at the factory and the sales were completed by shipments f. o. b. the factories.
2. Personnel Residing Within the State and Their Activities.
The sales organizations of the Chevrolet, Pontiac and Oldsmobile Divisions were similar in most respects. The zone manager was located in Portland and had charge of the sales operation. His job was “to secure and maintain a quality dealer organization ... to administer and promote programs, plans and procedures that will cause that dealer organization to give . . . the best possible business representation in this area.” R. 76. The district managers lived within the State of Washington and their jobs were “the maintenance of a quality organization — dealer organization — and the follow-through and administration of programs, plans and procedures within their district, that will help to develop the dealer organization, for the best possible financial and sales results.” R. 109. While he had no office within the State, the district manager operated from his home where he received mail and telephone calls and otherwise carried on the corporation’s business. He called upon each dealer in his district on an average of at least once a month, and often saw the larger dealers weekly. A district manager had from 12 to 30 dealers under his supervision and functioned as the zone manager’s direct con *576 tact with these dealers, acting “in a supervisory or advisory capacity to see that they have the proper sales organization and to acquaint them with the Divisional sales policies and promotional and training plans to improve the selling ability of the sales organization.” R. 246. In this connection, the district manager also assisted in the organization and training of the dealer’s sales force. At appropriate times he distributed promotional material and advised on used car inventory control.
It was also the duty of the district manager to discuss and work out with the dealer the 30-, 60- and 90-day projection of orders of estimated needs which the dealer or the district manager then filed with the zone manager. These projections indicated the number of cars a dealer needed during the indicated period and also included estimates for accessories and equipment. The projected orders were prepared and filed each month and the estimates contained in them could, for all practical purposes, be “construed as a purchase order.” [3]
In addition to the district manager, each of the Chevrolet, Pontiac and Oldsmobile Divisions also maintained service representatives who called on the dealers with regularity, assisting the service department in any troubles it experienced with' General Motors products. These representatives also checked the adequacy of the service department inventory to make certain that the dealer’s agreement was being complied with and to ensure the best possible service to customers. It was also their duty to note the appearance of the dealer’s place of business *577 and, where needed, to require rehabilitation, improved cleanliness or any other repairs necessary to achieve an attractive sales and service facility. At the dealer’s request, or on direction from his zone superior, the service representative also conducted service clinics at the dealer’s place of business, for the purpose of teaching the dealer and his service personnel the proper techniques necessary to the operation of an efficient service department. The service representative also gave assistance to the dealer with the more difficult customer complaints, some of which were registered with the dealer, but others of which were registered with the corporation.
During the tax period involved here the Chevrolet, Oldsmobile and Pontiac Divisions had an average of about 20 employees resident or principally employed in Washington.[4] General Motors Parts Division employed about 20 more.
The Chevrolet Division’s branch office at Seattle consisted of one man and his secretary. That office performed the function of getting better service for Washington dealers on orders of Chevrolet Division products. The branch office had no jurisdiction over sales or over other Chevrolet personnel in the State. Since January 1, 1954, Chevrolet Division has maintained a zone office in Seattle and has paid the tax without dispute.
3. Out-of-State Personnel, Performing In-State Activities.
The zone manager, who directed all zone activities, visited with each Washington dealer on the average of once each 60 days, the larger ones, each month. About one-half of these visits were staged at the dealer’s place of business and the others were at Portland. The zone *578 business management manager was the efficiency expert for the zone and supervised the capital structure and financing of the Washington dealers. The zone parts and service manager held responsibility for the adequacy of the Washington dealer services to customers. He worked through the local Washington service representative, but also made personal visits to Washington dealers and conducted schools for the promotion of good service policies. The zone used car manager (for the Chevrolet Division only) assisted Washington dealers in the disposition of used cars through appropriate display and reconditioning.
4. Activities of General MotoRs Parts Division.
During the period of this tax, the General Motors Parts Division warehoused, sold and shipped parts and accessories to Washington dealers for Chevrolet, Pontiac and Oldsmobile vehicles. It maintained warehouses in Portland and Seattle. No personnel of this division visited the dealers, but all of the Chevrolet, Pontiac and Oldsmobile dealers in Washington obtained their parts and accessories from these warehouses. Items carried by the Seattle warehouse were shipped from it, and those warehoused at Portland were shipped from there. The Seattle warehouse, which carried the items most often called for in Washington, employed from 20 to 28 people during the taxing period. The Portland warehouse carried the less frequently needed parts. The tax on the orders filled at the Seattle warehouse was paid but the tax on the Portland shipments is being protested.
III.
“[I]t is beyond dispute,” we said in Northwestern States Portland Cement Co. v. Minnesota, supra, at 458, “that a State may not lay a tax on the 'privilege’ of engaging in interstate commerce.” But that is not this case. To so contend here is to overlook a long line of cases of *579 this Court holding that an in-state activity may be a sufficient local incident upon which a tax may be based. As was said in Spector Motor Service, Inc., v. O’Connor, 340 U. S. 602, 609 (1951), “[t]he State is not precluded from imposing taxes upon other activities or aspects of this [interstate] business which, unlike the privilege of doing interstate business, are subject to the sovereign power of the State.” This is exactly what Washington seeks to do here and we cannot say that appellant has shown that its activities within the State are not such incidents as the State can reach. Norton Co. v. Department of Revenue, supra, at 537. Unlike Field Enterprises, Inc., v. Washington, 47 Wash. 2d 852, 289 P. 2d 1010, aff'd, 352 U. S. 806 (1956), citing Norton, supra, the Pontiac and Oldsmobile Divisions of General Motors had no branch offices in Washington. But these divisions had district managers, service representatives and other employees who were residents of the State and who performed substantial services in relation to General Motors’ functions therein, particularly with relation to the establishment and maintenance of sales, upon which the tax was measured. We place little weight on the fact that these divisions had no formal offices in the State, since in actuality the homes of these officials were used as corporate offices. Despite their label as “homes” they served the corporation just as effectively as “offices.” In addition, the corporation had a Chevrolet branch office and a General Motors Parts Division warehouse in Seattle.
Thus, in the bundle of corporate activity, which is the test here, we see General Motors’ activity so enmeshed in local connections that it voluntarily paid taxes on various of its operations but insists that it was not liable on others. Since General Motors elected to enter the State in this fashion, we cannot say that the Supreme Court of Washington erred in holding that these local incidents were *580 sufficient to form the basis for the levy of a tax,that would not run contrary to the Constitution. Norton Co. v. Department of Revenue, supra.
IV.
The tax that Washington levied is measured by the wholesale sales of the respective General Motors divisions in the State. It is unapportioned and, as we have pointed out, is, therefore, suspect. We must determine whether it is so closely related to the local activities of the corporation as to form “some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.” Miller Bros. Co. v. Maryland, 347 U. S. 340, 344-345 (1954). On the basis of the facts found by the state court we are not prepared to say that its conclusion was constitutionally impermissible. Norton Co. v. Department of Revenue, supra, at 538. Here, just as in Norton, the corporation so mingled its taxable business with that which it claims nontaxable that we can only “conclude that, in the light of all the evidence, the judgment attributing . . . [the corporation’s Washington sales to its local activity] was within the realm of permissible judgment. Petitioner has not established that such services as were rendered . . . [through instate activity] were not decisive factors in establishing and holding this market.” Ibid. Although mere entry into a State does not take from a corporation the right to continue to do an interstate business with tax immunity, it does not follow that the corporation can channel its operations through such a maze of local connections as does General Motors, and take advantage of its gain on domesticity, and still maintain that same degree of immunity.
V.
A more difficult question might arise from appellant’s claim of multiple taxation. Gwin, White & Prince, Inc., v. Henneford, 305 U. S. 434, 440 (1939). General Motors *581 claims that some of its products taxed by Washington are manufactured in St. Louis where a license tax, measured by sales before shipment, is levied. See American Mfg. Co. v. St. Louis, 250 U. S. 459 (1919). It is also urged that General Motors’ Oregon-based activity which concerns Washington sales might afford sufficient incidents for a similar tax by Oregon. The Court touched upon the problem of multiple taxation in Northwest Airlines v. Minnesota, supra, at 295, but laid it to one side as “not now before us.” Thereafter, in Northwestern States Portland Cement Co. v. Minnesota, supra, at 463, we held that “[i]n this type of case the taxpayers must show that the formula places a burden upon interstate commerce in a constitutional sense.” Appellant has not done this. It has not demonstrated what definite burden, in a constitutional sense, the St. Louis tax places on the identical interstate shipments by which Washington measures its tax. Cf. International Harvester Co. v. Evatt, 329 U. S. 416, 421-423 (1947). And further, it has not been shown that Oregon levies any tax on appellant’s activity bearing on Washington sales. In such cases we have refrained from passing on the question of “multiple taxation,” e. g., Northwestern States Portland Cement Co. v. Minnesota, supra, and we adhere to that position.

Affirmed.

 Relevant sections of the Washington statute as they were in force during the taxable period in this case, January 1, 1949, through June 30, 1953, are:
“Section 4. Prom and after the first day of May, 1935, there is hereby levied and there shall be collected from every person a tax *570 for the act or privilege of engaging in business activities. Such tax shall be measured by the application of rates against value of products, gross proceeds of sales, or gross income of the business, as the case may be, as follows:
“(e) Upon every person . . . engaging within this state in the business of making sales at wholesale; as to such persons the amount of tax with respect to such business shall be equal to the gross proceeds of sales of such business multiplied by the rate of one-quarter of one per cent;
“Section 5. For the purposes of this title . . .
“ (e) The term ‘sale at wholesale’ or ‘wholesale sale’ means any sale of .tangible personal property and any sale of or charge made for labor and services rendered in respect to real or personal property, which is not a sale at retail;
“ (f) The term ‘gross proceeds of sales’ means the value proceeding or accruing from the sale of tangible personal property and/or for services rendered without any deduction on account of the cost of property sold, the cost of materials used, labor costs, interest, discount paid, delivery costs, taxes, or any other expense whatsoever paid or accrued and without any deduction on account of losses.” Laws of Wash., 1949, c. 228, at 814-819.

 The dealers are independent merchants, often financing themselves, owning their own facilities and paying for all products upon delivery.

R. 341. A Chevrolet zone manager said that: “Once that projection and estimate has been made, and a meeting of minds between the district manager and the dealer, or his representative, arrived at, the dealer then places individual orders with us on a separate form for the merchandise. Those separate forms, of course, are to allow him to specifically specify color option, and things of that character.” R. 124.

 At times, Pontiac had three, Oldsmobile six and Chevrolet 17 assigned personnel in the State.