660 P.2d 1027

**PITTSBURGH AND MIDWAY COAL MINING COMPANY,
Petitioner-Appellant,**

v.

**REVENUE DIVISION, TAXATION AND REVENUE DEPARTMENT** of The State of New Mexico, Defendant-Appellee.

No. 5910.

Court of Appeals of New Mexico.

Feb. 3, 1983.

Rehearing Denied Feb. 21, 1983.
Certiorari Quashed May 3, 1983.

546

John B. Pound, Montgomery & Andrews, P.A., Santa Fe, Donald E. Wilson, Denver, Colo., for petitioner-appellant.

Edward F. Barnicle, Jr., Asst. Atty. Gen., Santa Fe, for defendant-appellee.

## OPINION

LOPEZ, Judge.

Pittsburgh and Midway Coal Mining Company (Taxpayer) appeals a decision and order of the Revenue Division of the Taxation and Revenue Department of the State of New Mexico (Department) imposing tax assessments of approximately $6,684,039.58, which includes gross receipt taxes, compensating taxes, penalty and interest. We affirm.

This appeal presents three issues for our determination: 1. The jurisdiction of this court to hear the appeal; 2. The legality of the imposition of the gross receipt taxes and the deductions claimed by Taxpayer; 3. Legality of the compensating tax and the deductions claimed by Taxpayer.

FACTS

In December 1979 the Department assessed Taxpayer for gross receipts and compensating taxes, interest and penalty. The Department asserted that Taxpayer owed gross receipt taxes on proceeds from the sales of coal to out-of-state buyers during the audit period January 1, 1973 through June 30, 1979. The Department contended that Taxpayer owed compensating taxes for the operation of four draglines at its McKinley County mine during the same period. Taxpayer protested both assessments and requested a formal hearing. An evidentiary hearing was held at the Department's office in May 1982. The Department entered its decision and order in which it found against Taxpayer on all issues except the penalty.

We shall set forth herein all the pertinent findings of the Department:

A.

1. The Taxpayer is a Missouri business for-profit corporation which maintains its principal office at Denver, Colorado. The Coal Company, authorized to do business in the State of New Mexico, is engaged in the business of mining and selling coal from properties within the County of McKinley, State of New Mexico.

2. The Revenue Division conducted an audit of the Coal Company's operations and properties in McKinley County, New Mexico, and of some of the Company's books of account at Denver, Colorado, during the months of September through November, 1979.

3. During the course of the audit, the Coal Company furnished some of its business records to the auditors for examination. The auditors requested access to additional records of the Coal Company, some of which were furnished and others of which were withheld. Upon completion of the audit, the Revenue Division furnished a copy of the audit report to the Coal Company.

4. As a result of said audit, and some additional investigatory work, the Revenue Division issued Assessment No. 151392 dated December 31, 1979 (Department Exhibit A) for the period commencing on January 1, 1973 and extending to June 30, 1979 for New Mexico gross receipts tax in the amount of $4,922,834.72, for New Mexico compensating tax in the amount of $847,967.28, for penalty in the amount of $567,073.52, and for interest through November 25, 1979 in the amount of $517,260.22; totaling $6,755,135.74; all pursuant to Chapter 7, Articles 1 and 9 NMSA 1978.

5. Thereafter the Revenue Division issued abatements of $30,941.35 against the New Mexico gross receipts tax assessed, $4,530.03 against the New Mexico compensating tax assessed, $5,381.72 against the penalty assessed and $12,397.35 against the interest assessed.

6. The Coal Company paid the Revenue Division $14,364.07 on account of New Mex-

ico compensating tax assessed, and $3,481.64 on account of interest assessed.

7. The remaining amounts of the assessment, unabated and unpaid, are $4,791,-893.34 for New Mexico gross receipts tax, $829,073.18 for New Mexico compensating tax, $561,691.80 for penalty, and $501,381.23 for interest through November 25, 1979; totaling $6,684,039.58. All of the Coal Company's liability, if any, for the taxes, penalty, and interest included within Assessment No. 151392 was incurred as a result of the Coal Company's activities in employing labor and equipment for the severance and removal of coal and its crushing, screening, blending, sale, and loading of said coal all within the County of McKinley, State of New Mexico.

8. The Coal Company filed a timely protest to Assessment No. 151392.

### B.

1. The Coal Company protested the assessment of New Mexico gross receipts tax upon the basis that it had been denied deduction for receipt from sales of coal which, it claims, were transaction in interstate commerce. The Taxpayer relies on §§ 72–16A–14.10 NMSA 1958 [sic] and 7–9–55 NMSA 1978 and Gross Receipts Tax Regulation 3(F):10.

2. The assessment of additional gross receipts taxes is predicted [sic] upon the inclusion in the gross receipts from sales made by the Taxpayer from its McKinley mine to out-of-state customers, primarily those located in the State of Arizona. Those sales were all made f.o.b. McKinley Mine, McKinley County, New Mexico, with title passing to the out-of-state customer when the coal is loaded into conveyances at the mine.

3. In support of its position the Taxpayer introduced into evidence six "Coal Agreement Contracts"—with five Arizona customers—which contracts provided for the furnishing of a given supply of coal at a particular rate of delivery for an extended period of time. The most discussed contract, with supplements, was the one with Arizona Public Service Company ("APS") where APS contracted to acquire coal for its electric generation station at Cholla, Arizona. The contract was negotiated over a prolonged period of time. Negotiations were conducted in Phoenix, Kansas City, Chicago and other places. Testimony does not show where the contract was signed by the parties. Under that contract, there was a contractual guarantee to APS that the Taxpayer had sufficient coal to meet the requirements of the purchaser and it provided that the Taxpayer would not in the future subsequently contract to sell coal to others that would reduce the amount of coal remaining for APS. To this end, the Taxpayer formally dedicated a geographic area portion of its McKinley coal mine to this particular customer. The contract provided that all coal delivered by the Taxpayer to APS shall be supplied from the Taxpayer's McKinley mine and title to all coal supplied shall pass to APS when coal is loaded in rail cars at the mine. The contract gave APS the right to change the point at which title to the coal passes and a supplement provided that APS shall have the right to divert coal to the Four Corners generating station in New Mexico. Apparently, APS never has diverted coal to the Four Corners Plant nor has it changed the place where title passes. APS also had the right, acting as agent for the Taxpayer, to sell coal to others.

4. Three of the coal agreement contracts with Arizona customers (including APS) provided for "unit train" transportation, apparently because of the volume of coal being transported. A unit train is a train which, as a whole, stays as a unit. The locomotives, hopper cars and caboose remain as a unit. The train as a unit comes to the coal mine where coal is loaded in the hopper cars, the train goes to its destination where the cars are unloaded and the train returns to the mine. At the mine, there is a spur or loop track which enables the train to turn around. These customers negotiated with the Santa Fe Railroad the terms and conditions of transporting the coal in unit trains in order to achieve the lowest freight rate. In these cases, the railroad company owns the locomotives and cabooses

used in the unit trains but, because of the economics involved, the customers apparently own the hopper cars in the unit trains. The customers pay the railroad for the transportation service.

5. At some time, and it is not clear when, the Taxpayer constructed, or had constructed, facilities to sample, weigh, and load coal into unit trains. These facilities included a coal storage area located between the mine operation and the loading operation. The storage area could contain as much as one hundred thousand tons of coal. When the unit train arrives, the coal is drawn from the storage area mechanically and by gravity to a belt. The belt leads to a vertical loading device which is mounted above the track where the train comes in. The cars pass under the loader which loads the railroad car. As part of the delivery process, coal passes over certain scales of weighing mechanisms prior to being placed in the car.

6. Prior to the time the Taxpayer had facilities for loading unit trains, all deliveries of coal were made at the Taxpayer's original loading site. At that facility, coal was loaded into hopper cars and the loaded cars remained in the area until the Santa Fe railroad picked up the car or cars. If, after cars are loaded, a specific customer is unable to accept the loaded cars, the cars can be sent to a different customer. The evidence does not show how long the loaded cars remained in the area before the railroad moved out the car or cars. This original loading site apparently was used for all loading other than loading unit trains.

7. Three of the contracts introduced into evidence (which involved two Arizona purchasers) did not call for unit train loading and under these contracts the loading occurred at the original loading site. These contracts provided that title to coal passed from the seller to the buyer at the time the hopper cars were loaded. In at least one occasion, cars loaded for the Flintkote Co. were diverted from a Flintkote plant to an APS operation in Arizona.

8. In addition to sales made under the six contracts introduced in evidence, the Taxpayer made extensive sales to others some of whom were out of New Mexico and out of Arizona customers. In such cases, coal was loaded at the original loading site into hopper cars or trucks. With one exception, title passed from seller to buyer when the car or truck was loaded. The evidence does not show the number of sales, or the applicable periods of time when sales occurred, in connection with these other sales.

9. At the hearing the Taxpayer gave estimates of sales of coal to its customers but the evidence does not show the amounts received from such sales or the applicable periods of time when sales of coal occurred in connection with unit trains.

10. (a) In summary, the Coal Company loaded all of the coal which it severed and sold from lands within McKinley County, New Mexico into conveyances at the site of the Coal Company's mining operations within McKinley County, New Mexico. The conveyances consisted of trucks and railroad cars. None of the conveyances were owned or controlled by the Coal Company, or by any person, firm or corporation having common ownership or a parent-subsidiary relationship with the Coal Company. Arrangements for the provision of the conveyances to receive the coal were made by the buyers of the coal. All of the charges for use of the conveyances and for the transportation of the coal away from the Coal Company's mining site were paid by the buyers of the coal.

(b) After the Coal Company loaded said coal sold into said conveyances, the conveyances were removed from the Coal Company's premises in McKinley County, New Mexico by others than the Coal Company, and were thereafter transported by other than the Coal Company to other places specified by the buyers of the coal, some within and some beyond the State of New Mexico. Some of the coal was transported to locations within the States of Missouri, Texas, Arizona, and California, as well as to other locations within the State of New Mexico.

(c) The Coal Company sold all, or virtually all of its coal, upon written contracts and not oral contracts. Six such contracts were

admitted into evidence. Each of the Coal Company's contracts for the sale of coal which were admitted into evidence provided that the title to all coal sold will pass from the Coal Company to the buyer when the coal is loaded into railroad cars at the Coal Company's mining site in McKinley County, New Mexico; and testimony rendered by witnesses for the Coal Company established that the same provision with respect to the passage of title to coal sold prevailed in the other contracts referred to but not offered in evidence. The various contracts were negotiated and executed in various states, including New Mexico, and the billings for coal sold and the receipts of payments therefor were effected in the States of New Mexico and Colorado. After the coal sold was loaded into the conveyances, the risks of loss, damage and disappearance of the coal was solely borne by the buyers.

11. The Coal Company paid use taxes to the State of Arizona based upon the value of some of the coal sold at its mining site in McKinley County, New Mexico and thereafter transported into the State of Arizona. The Coal Company did not pay any transaction privilege (commonly known as sales) tax to the State of Arizona. The Coal Company did not pay any sales or use taxes to the States of Missouri, Texas, or California on account of coal sold at its mining site in McKinley County, New Mexico and thereafter transported by the buyers of the coal into those states. The Coal Company billed customers for, and has been reimbursed by the buyers of the coal for said use taxes paid to the State of Arizona.

12. The Coal Company has applied for a refund of the Arizona use taxes paid, and has requested the State of Arizona to withhold action upon that application pending the determination of this New Mexico protest proceeding.

### C.

1. The Coal Company protested the assessment of New Mexico compensating tax upon the basis that it had been denied deduction of the 50 percent of the value of its dragline equipment to which it claims to be entitled pursuant to §§ 72–16A–15 NMSA 1953 and 7–9–77 NMSA 1978 and Gross Receipts Tax Regulations 14.17:4 and 62:4.

2. The Coal Company does not contend that any of its dragline equipment upon the value of which New Mexico compensating tax was assessed in Assessment No. 151392 consisted of agricultural implements, farm tractors or aircraft, nor that any tangible personal property of the nature of a dragline was traded-in or the subject of a trade-in allowance at the time its dragline equipment was bought.

3. Each of the Coal Company's four units of dragline equipment is substantially identical to the others. An example is shown in Taxpayer's Exhibit 5. Each is a huge machine powered by outside sources—electricity. The electricity is furnished by trailing electric cables carrying 6900 volts connected to fixed sources of electric power. Each is equipped with a boom at least 320 feet long with cable hoists to operate a suspended 55 cubic yard bucket cabable [sic] of containing 260,000 pounds for digging and casting overburden. Each is about 30 stories high and weighs about 6,500,000 pounds.

Taxpayer only challenges the portions of Finding A7 which includes "employing labor and equipment for the severance and removal of coal and its crushing, screening, blending, sale, and loading of said coal all within the County of McKinley, State of New Mexico". It challenges D4 and the portion challenged only includes "the customers apparently own the hopper cars and the unit trains." It also challenges portions of B10 which includes "including New Mexico." The following statutes and Department Gross Receipt Regulations (Regulations) are pertinent to our decision in this case:

7–9–4, N.M.S.A.1978. **Imposition and rate of tax; denomination as "gross receipts tax."**

A. For the privilege of engaging in business, an excise tax equal to three and three-fourths percent of gross receipts is imposed on any person engaging in business in New Mexico.

B. The tax imposed by this section shall be referred to as the "gross receipts tax."

7–9–7, N.M.S.A.1978. **Imposition and rate of tax; denomination as "compensating tax."**

A. For the privilege of using property in New Mexico, there is imposed on the person using property an excise tax equal to three and three-fourths percent of the value, at the time of acquisition or of introduction into the state, whichever is later, or of conversionto use by the manufacturer of property that was:

(1) manufactured by the person using the property in the state;

(2) acquired outside this state as the result of a transaction that would have been subject to the gross receipts tax had it occurred within this state; or

(3) acquired as the result of a transaction which was not initially subject to the compensating tax imposed by Paragraph (2) of this subsection or the gross receipts tax but which transaction, because of the buyer's subsequent use of the property, should have been subject to the compensating tax imposed by Paragraph (2) of this subsection or the gross receipts tax.

B. For the privilege of using services rendered in New Mexico, there is imposed on the person using such services an excise tax equal to three and three-fourths percent of the value of the services at the time they were rendered. The services, to be taxable under this subsection, must have been rendered as the result of a transaction which was not initially subject to the gross receipts tax but which transaction, because of the buyer's subsequent use of the services, should have been subject to the gross receipts tax.

C. The tax imposed by this section shall be referred to as the "compensating tax."

7–9–8, N.M.S.A.1978. **Presumption of taxability and value.**

A. To prevent evasion of the compensating tax and the duty to collect it, it is presumed that property bought or sold by any person for delivery into this state is bought or sold for a taxable use in this state.

B. In determining the amount of compensating tax due on the use of property, it is presumed, in the absence of preponderant evidence of another value, that the value means the total amount of money or the reasonable value of other consideration paid for property exclusive of any type of time-price differential. However, in an exchange in which the amount of money paid does not represent the value of the property or property and service purchased, the compensating tax shall be imposed on the reasonable value of the property or property and service purchased.

C. In determining the amount of compensating tax due on the use of a service, it is presumed, in the absence of preponderant evidence of another value, that the value means the total amount of money or the reasonable value of other consideration paid for the service exclusive of any type of time-price differential. However, in an exchange in which the amount paid does not represent the value of the service purchased, the compensating tax shall be imposed on the reasonable value of the service purchased.

7–9–22, N.M.S.A.1978. **Exemption; gross receipts tax; vehicles.**

Exempted from the gross receipts tax are the receipts from selling vehicles on which a tax is imposed by Section 64–11–15 NMSA 1953 and on vehicles subject to registration under Section 64–3–12.3 NMSA 1953.

7–9–23, N.M.S.A.1978. **Exemption; compensating tax; vehicles.**

Exempted from the compensating tax is the use of vehicles on which the tax imposed by Section 64–11–15 NMSA 1953 has been paid and on the use of vehicles subject to registration under Section 64–3–12.3 NMSA 1953.

7–9–55, N.M.S.A.1978. **Deduction; gross receipts tax; transactions in interstate commerce.**

Receipts from transactions in interstate commerce may be deducted from gross

receipts to the extent that the imposition of the gross receipts tax would be unlawful under the United States constitution.

Receipts from transmitting messages or conversations by telegraph, telephone or radio other than from one point in this state to another point in this state and receipts from the sale of radio or television broadcast time when the advertising message is supplied by or on behalf of a national or regional seller or advertiser not having its principal place of business in or being incorporated under the laws of this state, may be deducted from gross receipts. Commissions of advertising agencies from performing services in this state may not be deducted from gross receipts under this section.

**7-9-77, N.M.S.A.1978. Deduction; compensating tax.**

A. Fifty percent of the value of agricultural implements, farm tractors, aircraft or vehicles that are not required to be registered under the Motor Vehicle Code [Chapter 66 NMSA 1978] may be deducted from the value in computing the compensating tax due. Any deduction allowed under Subsection B of this section is to be taken before the deduction allowed by this subsection is computed.

B. That portion of the value of tangible personal property on which an allowance was granted to the buyer for a trade-in of tangible personal property of the same type that was bought may be deducted from the value in computing the compensating tax due.

**G.R. REGULATION 3(F):10—DELIVERY OUTSIDE NEW MEXICO—**

Receipts of New Mexico sellers from sales of property to New Mexico residents who request delivery to be made outside New Mexico are subject to the Gross Receipts Tax.

Receipts of New Mexico sellers from sales of property to nonresidents of New Mexico where delivery is made outside New Mexico by seller's vehicle, common carrier, or U.S. Mail are receipts from transactions in interstate commerce and

are deductible from the seller's gross receipts pursuant to Section 7-9-55, and regulations thereunder.

Example 1: T, a Tucumcari appliance dealer, sells a freezer to a restaurant in Muleshoe, Texas. If T delivers the freezer to Muleshoe in his own truck or if T delivers the freezer to Muleshoe by common carrier, T's receipts from the sale may be deducted from his gross receipts. Section 7-9-55. However, if the buyer picks up the freezer at T's Tucumcari place of business, T's receipts are not deductible because the sale was fully consummated in New Mexico.

**G.R. REGULATION 55:2—SALES IN INTERSTATE COMMERCE—**

Receipts of New Mexico sellers from sales of property to New Mexico residents who request delivery to be made out-of-state are not transactions in interstate commerce, and are subject to Gross Receipts Tax.

Receipts of New Mexico sellers from sales of property to nonresidents of New Mexico who accept delivery of the property in New Mexico are not transactions in interstate commerce, and are subject to Gross Receipts Tax.

Receipts of New Mexico sellers from sales of property to nonresidents of New Mexico where delivery is made out-of-state by seller's vehicles, U.S. Mail, or common carrier are receipts from transactions in interstate commerce and such receipts may be deducted from the gross receipts of the seller. See G.R. REGULATION 3(F):10.

**G.R. REGULATION 62:4—MINING EQUIPMENT—**

The items of mining equipment listed below are "vehicles" as that term is used in this section and Section 7-9-77. Therefore, the fifty percent (50%) deduction provisions of those sections apply to receipts derived from the sale of or the use of such machines. A trade-in deduction pursuant to Section 7-9-71, if applicable, must be taken before the deduction allowed by this section is computed.

The following machines are "vehicles" within the meaning of this section and Section 7–9–77:

Shuttle cars are self contained mobile mining machines mounted on rubber tire wheels, used to transport broken ore from the ore face in the mine to a loading point, where the ore is loaded into an underground train.

Undercutting machines are self-contained mobile mining machines mounted on rubber tire wheels. These machines are used to under cut or bottom cut the ore face prior to drilling.

Mining drills are self-contained mobile mining machines mounted on rubber tire wheels used to drill holes above the undercut prior to shooting.

Loading machines are self-contained mobile mining machines mounted on tractor treads and are similar to front end loaders. They are used to load ore into shuttle cars.

Electric shovels are self-contained mobile mining machines mounted on tractor treads and are used in open pit mining operations to load ore and waste material into dump trucks.

The following machines are *not* "vehicles" within the meaning of this section and Section 7–9–77:

Diesel locomotives operated on rails used in underground mining operations. Cars used with diesel locomotives in underground mining operations.

## I. JURISDICTION

[1] The Department challenges our authority to review this case on the following grounds: 1. That Taxpayer has failed to file a complaint on appeal as required by section 7–1–25(B), N.M.S.A.1978 (1982 Repl. Pamph.); 2. Taxpayer's brief fails to specify any of the exclusive grounds upon which to set aside the decision and order provided by § 7–1–25(D), N.M.S.A.1978 (1982 Repl. Pamph.); 3. Taxpayer did not assert at the hearing that the assessment violated the Department's regulations and therefore it may not so plead in this appeal.

We have reviewed the record and the briefs and conclude that Taxpayer has sufficiently and substantially complied with the pertinent appellate rules. We have jurisdiction in this matter.

## II. GROSS SALES TAX

■ The Department assessed gross receipt taxes, compensating taxes, penalties and interest against Taxpayer. The assessment was for Taxpayer's activities in McKinley County including sale of coal to non-residents of New Mexico and the use of four draglines. The assessments were made pursuant to §§ 7–9–4 and 7–9–7, *supra.*

Taxpayer challenges this assessment generally claiming that the activities for which the taxes are imposed constitute interstate commerce and that the tax violates the Commerce Clause of the Federal Constitution (Article 1, § 8, clause 3). To support this position Taxpayer relies mainly on § 7–9–77 and Regulation 62:4, *supra.* The Department contends that the tax imposed is consistent with the gross receipt tax law of New Mexico and specifically §§ 7–9–2, 7–9–5, N.M.S.A.1978, 7–9–4, 7–9–55, *supra,* and Regulations 3F:10 and 55:2, *supra.* The Department further contends that these taxes are compatible with the Federal Constitution Commerce Clause.

Since the taxes challenged by Taxpayer constitute deductible items we shall set forth the duty of Taxpayer in this situation. First, pursuant to section 7–9–5, *supra,* a presumption of taxability arises. Second, in *Reed v. Jones,* 81 N.M. 481, 468 P.2d 882 (Ct.App.1970), this court stated:

The burden is on the taxpayer to establish clearly his right to the deduction and the intention to authorize the deduction claimed by the taxpayer must be clearly and unambiguously expressed in the statute. (citations omitted).

\* \* \* \* \* \*

In speaking on exemptions from taxation the United States Supreme Court stated in *Hoge v. Railroad Co.,* 99 U.S. 348, 25 L.Ed. 303 (1879), the following:

" * * * But though this power is recognized, it is accompanied with the qualification that the intention of the legislature to grant the immunity must be clear beyond a reasonable doubt. It cannot be inferred from uncertain phrases or ambiguous terms. The power of taxation is an attribute of sovereignty, and is essential to every independent government. Stripped of this power, it must perish. Whoever, therefore, claims its surrender must show it in language which will admit of no other reasonable construction. If a doubt arise [sic] as to the intent of the legislature, it must be solved in favor of the State."

81 N.M. at 482–83, 468 P.2d 882.

Any exception or rights to deductions must be contained within the expressed letter or necessary scope of the exempting language. See McKee v. Bureau of Revenue, 63 N.M. 185, 315 P.2d 832 (1957).

In order for us to decide the issue at hand we must consider certain factors relating to the activities of Taxpayer in McKinley County, New Mexico: 1. We consider the matter of when title to the coal sold passed to the buyer; 2. We consider the matter of agency on the part of the transporter; and 3. We consider, the theory as to whether gross receipt taxes on the privilege of Taxpayer to do business in New Mexico violates the Federal Commerce clause when it is applied to an interstate activity with a substantial nexus to New Mexico.

1. TITLE OF COAL SOLD BY TAXPAYER

■ In each of the contracts with out-of-state buyers, title to the coal and risk of loss passed from Taxpayer to its customers after the coal was loaded onto the appropriate train, at the mine. The cars in which the coal was loaded were owned by the buyer. After the coal was loaded the transporter was in custody and control of the coal until it reached the buyers' site of use. The official weight of the coal was determined at the McKinley mine when it was loaded into the railroad hopper cars. There is substantial evidence, and there are suffi-

cient findings, that title of the coal did pass to Taxpayer's customers when it was loaded in cars or trucks in New Mexico. Therefore, the question is whether, under the facts and circumstances of this case, passage of title in New Mexico is a matter to be considered as a factor justifying the imposition of the gross receipts tax.

■ Taxpayer argues that the passage of title approach is an attempt to avoid a collision with the Commerce Clause. We disagree. In State Tax Com'n of Utah v. Pacific States Gas Iron Company, 372 U.S. 605, 83 S.Ct. 925, 10 L.Ed.2d 8 (1963), the court held that where a vendor sells property, and passage of title and delivery occurs in the vendor state, that state can levy and collect the sales tax on that transaction.

· Regulation 3(F):10, supra, provides that if an out-of-New Mexico buyer picks up the subject of his purchase at the New Mexico vendor's place of business, the vendor's gross receipts are not deductible. Regulation 55:2, supra, provides that receipts of New Mexico sellers from non-residents of New Mexico who accept delivery in New Mexico are subject to the tax. Similarly, in Baskin-Robbins Ice Cream Co. v. Revenue Div., 93 N.M. 301, 599 P.2d 1098 (Ct.App. 1979), the court stated as follows:

Taxpayer is not engaged in interstate commerce. The tax here imposed is conditioned on Creamland's local business of manufacturing and selling ice cream products in New Mexico. It is not a tax imposed on the importation of property or the rendering of services outside the State; neither is it a tax measured by income derived from manufacturing and selling ice cream products in any other state; nor is the tax different from that assessed and paid by local taxpayers in manufacturing and selling ice cream products for others.

93 N.M. at 306, 599 P.2d 1098.

In Miami Copper Co. Etc. v. State Tax Com'n, 121 Ariz. 150, 589 P.2d 24 (Ct.App. 1978) the Arizona Court of Appeals stated as follows:

It is well established, however, that intent to export to another nation or state does not alone determine whether in fact the goods have become exports or have entered interstate commerce. *See Kosydar v. National Cash Register,* 417 U.S. 62, 94 S.Ct. 2108, 40 L.Ed.2d 660 (1974); *Coe v. Errol,* 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715 (1886).

The reasoning behind the rule is well stated in *Heisler v. Thomas Colliery Co.,* 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237 (1922). "... If the possibility, or *indeed certainty,* of exportation of a product or article from a state, determines it to be in interstate commerce before the commencement of its movement from the state, it would seem to follow that it is in such commerce from the instant of its growth or production, and in the case of coals, as they lie in the ground. The result would be curious. It would nationalize all industries, it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massachusetts and the woolen industries of other states at the very inception of their production or growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet 'on the hoof,' wool yet unshorn, the coal yet unmined because they are in varying percentages destined for and surely to be exported to states other than those of their production. [Emphasis added.]" 260 U.S. at 259–60, 43 S.Ct. at 86, 67 L.Ed. at 243.

From the foregoing, we conclude that the taxpayer's mineral products did not enter interstate commerce at any time before completion of the smelting process in Arizona. **A taxpayer may not immunize from taxation the value added to his product merely because it was committed to eventual out-of-state consumption or sale before it was subjected to local processing or manufacture.** Taxpayer's copper did not enter interstate commerce as that term is contemplated by A.R.S. § 42–1316 until it began its journey to the New Jersey and Texas refineries. [Emphasis added.]

589 P.2d at 28–29. *See also State Board of Equalization v. Blind Bull Coal Co.,* 55 Wyo. 438, 101 P.2d 70 (1940), (Wyoming Supreme Court gave examples of activities that precede interstate transportation and which were treated as taxable local events.)

We conclude that the question of title and delivery of coal in New Mexico is a positive factor upon which to determine that the tax does not interfere with the Commerce Clause of the U.S. Constitution.

## 2. AGENCY

■ The reviewing officer made findings showing that he considered it to be important whether the transporter of the coal was the buyers' agent. Evidence at the hearing showed that the coal was loaded at the mine into rail cars or trucks. In either case, the means of conveyance was that of the buyers. There was no evidence that coal was transported by Taxpayer, or that a common carrier was employed. *See* Finding Part A, 10(a), *supra.*

Notwithstanding the findings, Taxpayer contends that agency is not significant. We disagree. *See Standard Oil Co. v. Johnson,* 24 Cal.2d 40, 147 P.2d 577 (Cal.1944). The court in *Standard Oil* stated that whether delivery to the carrier constituted delivery to the buyer depended upon intentions of the parties, as ascertained from the contract and other factors in the case. 147 P.2d at 580. In the case at bar, the buyers owned the hopper cars or trucks and arranged for the transportation of the coal. Furthermore, we concluded above that title passed when the coal was loaded into the buyers' cars or trucks.

We conclude that the coal did not enter interstate commerce until after title and delivery passed. The railroad or the respective transporter for the buyers was their agent, designated to accept delivery of the coal. Applying agency principles, the delivery of coal to the agent was in effect delivery to the buyer. Accordingly, agency be-

comes an important factor for determination of this matter.

## 3. CONFLICT WITH THE COMMERCE CLAUSE

■ Consideration of whether a state imposed tax runs afoul of the Commerce Clause of the Federal Constitution is governed by the four part test of *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). To be sustained, a state tax upon items connected with interstate commerce must: (A) be applied to an activity with a substantial nexus with the taxing state; (B) be fairly apportioned; (C) not discriminate against interstate commerce; and (D) be fairly related to the services provided by the state. 430 U.S. at 279, 97 S.Ct. at 1079. We will examine each prong of the test.

### A. *Substantial Nexus With the Taxing State*

■ The first requirement for valid imposition of a state tax is that the activity taxed has a substantial nexus with the taxing state. *Complete Auto Transit, Inc. v. Brady, supra.* In the case at bar gross receipts taxes were assessed against Taxpayer for the sale of coal. The New Mexico Supreme Court stated in *Bennett v. Western Sur. Co.,* 95 N.M. 13, 14, 618 P.2d 357 (1980), that " 'sale' means 'the passing of title and possession of property for money which the buyer pays, or promises to pay.' " The record shows that title to and possession of the coal passed to the buyers in New Mexico. Moreover, delivery to the buyers' conveyances was made in New Mexico, and the buyers' legal obligations became fixed in the state. Accordingly, evidence in the record supports the determination that the activity taxed had a substantial nexus with New Mexico.

### B. *The Tax Must Be Fairly Apportioned*

■ The second prong of the test in *Complete Auto Transit* is that taxes imposed upon interstate commerce must be fairly apportioned. The thrust of this requirement is that while interstate commerce may be required to bear its fair share of the cost of state government, the tax cannot amount to a trade barrier. *See Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981). The Coal Company contends that because the New Mexico gross receipts tax is unapportioned it requires the Coal Company to pay more than a fair share.

■ In *General Motors Corporation v. Washington,* 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964), the United States Supreme Court addressed the imposition of a gross receipts tax as follows:

> A careful analysis of the cases in this field teaches that the validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation. For our purposes the decisive issue turns on the operating incidence of the tax. In other words, the question is whether the State has exerted its power in proper proportion to appellant's activities within the State and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded. Where, as in the instant case, the taxing State is not the domiciliary State, we look to the taxpayer's business activities within the State, i.e., the local incidents, to determine if the gross receipts from sales therein may be fairly related to those activities. As was said in *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 444, 61 S.Ct. 246, 250, 85 L.Ed. 267 (1940), "[t]he simple but controlling question is whether the state has given anything for which it can ask return."

337 U.S. at 440–41, 84 S.Ct. at 1568.

In the case at bar, the tax was imposed on Taxpayer's gross receipts derived from the sales of coal. As was set out above, the delivery and sale of the coal was consummated within the borders of New Mexico. Therefore, according to the authority cited, and the facts of this case, there is ample evidence to support a determination that the tax was fairly apportioned.

## C. *The Tax Cannot Discriminate Against Interstate Commerce*

The third requirement of the test in *Complete Auto Transit* is that the tax cannot discriminate against interstate commerce. The purpose for this prong of the test is to ensure that intrastate and interstate commerce stand on the same footing. Accordingly, no state is permitted to impose taxes which discriminate against interstate commerce by providing direct commercial advantage to local enterprises. *Boston Stock Exch. v. State Tax Com'n.*, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977). *See also Commonwealth Edison Co. v. Montana, supra.* Our review of the record failed to produce, and the parties do not point us to, any evidence that intrastate and interstate coal mining operation are taxed in a disparate fashion. Therefore, we find nothing which refutes the determination that the tax did not discriminate against interstate commerce.

## D. *The Tax Must Be Fairly Related To the Services Provided By the State*

The fourth and final prong of the test in *Complete Auto Transit* is that the tax imposed must bear a fair relation to the services provided by the state. The Court in *Commonwealth Edison v. Montana* explained the operation of this requirement as follows:

This Court has indicated that States have considerable latitude in imposing general revenue taxes. The Court has, for example, consistently rejected claims that the Due Process Clause of the Fourteenth Amendment stand as a barrier against taxes that are "unreasonable" or "unduly burdensome." See, e.g., *Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974); *Magnano Co. v. Hamilton*, 292 U.S. 40, 54 S.Ct. 599, 78 L.Ed. 1109 (1934); *Alaska Fish Salting & By-Products Co. v. Smith*, 255 U.S. 44, 41 S.Ct. 219, 65 L.Ed. 489 (1921). Moreover, there is no requirement under the Due Process Clause that the amount of general revenue taxes collected from a particular activity must be reasonably related to the value of the services provided to the activity. Instead, our consistent rule has been:

"Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied.

"A tax is not an assessment of benefits. It is, as we have said, a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. Any other view would preclude the levying of taxes except as they are used to compensate for the burden on those who pay them, and would involve abandonment of the most fundamental principle of government—that it exists primarily to provide for the common good." *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 521–522, 57 S.Ct. 868, 878–79, 81 L.Ed. 1245 (1945) (citations omitted).

See *St. Louis & S.W.R. Co. v. Nattin*, 277 U.S. 157, 159, 48 S.Ct. 438, 72 L.Ed. 830 (1928); *Thomas v. Gay*, 169 U.S. 264, 280, 18 S.Ct. 340, 346, 42 L.Ed. 740 (1898). There is no reason to suppose that this latitude afforded the States under the Due Process Clause is somehow divested by the Commerce Clause merely because the taxed activity has some connection to interstate commerce; particularly when the tax is levied on an activity conducted within the State. "The exploitation by foreign corporations [or consumers] of intrastate opportunities under the protection and encouragement of local government offers a basis for taxation as unrestricted as that for domestic corporations." *Ford Motor Co. v. Beauchamp*, 308 U.S. 331, 334–335, 60 S.Ct. 273, 275, 84 L.Ed. 304 (1939); *see also Ott v. Mississippi Valley Barge Line Co.*, 336 U.S. 169, 69 S.Ct. 432, 93 L.Ed. 585 (1949). To accept appellants' apparent suggestion

that the Commerce Clause prohibits the States from requiring an activity connected to the interstate commerce to contribute to the general cost of providing governmental services, as distinct from those costs attributable to the taxed activity, would place such commerce in a privileged position. But as we recently reiterated, " '[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing business.' " *Colonial Pipeline Co. v. Traigle*, 421 U.S. 100, 108, 95 S.Ct. 1538, 1543, 44 L.Ed.2d 1 (1975), quoting *Western Live Stock v. Bureau of Revenue*, 303 U.S., [250] at 254, 58 S.Ct., [546] at 548 [82 L.Ed. 823]. The "just share of state tax burden" includes sharing in the cost of providing "police and fire protection, the benefit of a trained work force, and 'the advantages of a civilized society.' " *Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. 207, 228, 100 S.Ct. 2109, 2123, 65 L.Ed.2d 66, quoting *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S., [434] at 445, 99 S.Ct. 1813, 1819–20 [60 L.Ed.2d 336]. See *Washington Revenue Dept. v. Association of Wash. Stevedoring Cos.*, 435 U.S. [734] at 750–751, 98 S.Ct., [1388] at 1399 [55 L.Ed.2d 682]; *id.*, at 764, 98 S.Ct., at 1406 (POWELL, J., concurring); *General Motors v. Washington*, 377 U.S. 436, 440–441, 84 S.Ct. 1564, 1567–68, 12 L.Ed.2d 430 (1964).

101 S.Ct. at 2956–57.

In the case at bar the record demonstrates that the tax revenues were used to support New Mexico's services to Taxpayer, their mine and employees, and to benefit the economic, legal, political and social systems afforded every resident, whether citizen or not. Accordingly, we find sufficient evidence to support the determination that the tax was related to the service provided.

## E. SUMMARY

■ Our application of the test in *Complete Auto Transit* reveals that the business of Taxpayer taxed occurs entirely within McKinley County, New Mexico (criterion 1). The tax is applied equally to interstate and intrastate commerce (criterion 2). The tax is limited to a base which relates only to Taxpayer's activities within McKinley County, New Mexico, and does not discriminate against interstate commerce because its application is to activities conducted, and revenues realized, by Taxpayer wholly within New Mexico (criterion 3). And finally, the tax is intimately related to "services" provided by the State: the availability of the coal itself, as well as the labor force, roads, environment and protection afforded to Taxpayer by the State (criterion 4). The New Mexico Gross Receipts Tax Act, in its application to Taxpayer meets every test of validity prescribed by the federal constitution and courts.

Considering all the factors of activities of Taxpayer, including the sale of the coal, the passage of the title, the matter of agency and other factors incidental to Taxpayer's activities, and based upon authorities which we have reviewed, we hold that the imposition of the taxes did not impermissibly interfere with the Commerce Clause of the Federal Constitution. We conclude that the decision of the Department was neither capricious nor arbitrary and that it was made in accordance with the facts and the law applicable to the case at bar.

## III. COMPENSATING TAXES ON DRAGLINES

The Department assessed compensating taxes with interest and penalty on the use of four draglines, pursuant to § 7–9–7, *supra*. The assessment was protested by Taxpayer but upheld by the Hearing Examiner. Taxpayer challenges the assessment on grounds that it is entitled to a deduction provided by § 7–9–77, *supra*, and Regulation 66:4. The argument of Taxpayer is that if draglines are not vehicles under the Motor Vehicle Code they should be considered vehicles under § 7–9–77 and Regulation 62:4. We would agree with this statement if we accepted the premise that the language of the statute is plain in the sense that it can be reasonably read only as

Taxpayer would read it. But we do not agree with that premise. "The notion that because words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification." *U.S. v. Monia,* 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943) (Frankfurter, Justice, dissenting).

Our duty is to find that interpretation which can most fairly be said to be imbedded in the statute in the sense of being most harmonious with its scheme and with the general purpose that the Legislature manifested. The question is whether draglines are vehicles under § 7–9–77, *supra,* and the pertinent regulations. The evidence in respect to the draglines is clear and uncontradicted. The Hearing Examiner's findings are not challenged in respect to draglines. Therefore, the facts of the Hearing Examiner are the facts before this court. Our conclusion by *Kaiser Steel Corp. v. Revenue Division,* 96 N.M. 117, 628 P.2d 687 (Ct.App.) *cert. denied,* 96 N.M. 116, 628 P.2d 686 (1981), is controlling in the case at bar. This court said:

> From all the foregoing, we find it impossible to conclude that the continuous miner and dragline are "vehicles" under the Motor Vehicle Code. *Accord Gibbons & Reed Company v. Bureau of Revenue,* 80 N.M. 462, 457 P.2d 710 (1969).

> \* \* \* \* \* \*

> Because the machine must, in the first instance, be a 'vehicle' in order to qualify under either exception, see *Gibbons & Reed Company v. Bureau of Revenue, supra,* and, as shown above, neither the dragline nor continuous miner can be so classified, under § 66–1–4(B)(71), neither are 'vehicles not required to be registered' within the meaning of § 7–9–77. Further, as to the requirements of § 66–3–1(B), a finding that a machine 'moves' or is 'mobile' does not in itself support a conclusion that the machine can be 'driven or moved upon a highway' for any purpose. In fact, the evidence here is to the contrary.

> \* \* \* \* \* \*

> Neither the dragline or continuous miner are 'vehicles' exempt from registration under the Motor Vehicle Code.

96 N.M. at 122–23, 628 P.2d 687. The court in *Kaiser* also noted the following:

> A similar case was presented in *Gibbons & Reed Company v. Bureau of Revenue,* 80 N.M. 462, 457 P.2d 710 (1969), which held that a piece of mining equipment called a 'mole' was not 'special mobile equipment' because it did not come within the general descriptive terms of the section. [§ 64–1–12, N.M.S.A.1953 Comp., now § 66–1–4(B)(60), N.M.S.A.]. The 'mole' which weighed approximately one hundred tons, was used to move employees and supplies in and out of a tunnel and to remove excavated material from the tunnel.

96 N.M. at 123 n. 1, 628 P.2d 687.

We conclude that the draglines are not vehicles under either § 7–9–77 or Regulation 42:10, *supra.* The decision of the Department in denying deduction for compensating tax and in assessing the compensating tax was neither arbitrary nor capricious, but made in accordance with law. The decision and order of the Department is affirmed.

Appellate costs shall be paid by the Taxpayer.

IT IS SO ORDERED.

HENDLEY, J., concurs in the result only.

DONNELLY, J., concurs.